**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADONIS GONZALEZ, derivatively on behalf of ASTRA SPACE INC. F/K/A HOLICITY INC., | |
| Plaintiff, | Case No.: 1:22-cv-02401 |
| vs. | |
| CHRIS C. KEMP, KELYN BRANNON, STEVEN EDNIE, ADAM LONDON, MICHÈLE FLOURNOY, MICHAEL LEHMAN, CRAIG O. MCCAW, LISA NELSON, and SCOTT STANFORD, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ASTRA SPACE INC. F/K/A HOLICITY INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Adonis Gonzalez ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Astra Space Inc. f/k/a Holicity Inc. ("Astra" or the "Company"),[1] files this Verified Shareholder Derivative Complaint against Individual Defendants Chris C. Kemp ("Kemp"), Kelyn Brannon ("Brannon"), Steven Ednie ("Ednie"), Adam London ("London"), Michèle Flournoy ("Flournoy"), Michael Lehman ("Lehman"), Craig O. McCaw ("McCaw"), Lisa Nelson ("Nelson"), and Scott Stanford ("Stanford") (collectively, the "Individual Defendants," and together with Astra the "Defendants") for breaches of their fiduciary

---

[1] "Holicity" also refers herein to the "Company" prior to the July 2021 merger (the "Merger") and name change, whereas "Astra" refers to the "Company" after the Merger and name change.

duties as current/former controlling shareholders, directors and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against the Individual Defendants—except Defendants Ednie and Brannon—for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and against Defendants Kemp, Brannon, and Ednie for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 2, 2021 through December 29, 2021, at least (the "Relevant Period").

2.     Astra is an aerospace company whose stated mission is to launch a new generation of launch and space services and products to improve life on Earth. The Company purportedly utilizes satellites in Low Earth Orbit ("LEO") and aims to develop the first mass-produced system of small launch vehicles.

3.     Holicity was founded as a special purpose acquisition company ("SPAC") supported by major telecom billionaire, Defendant McCaw. Holicity's initial public offering

2

("IPO") closed in August 2020, after which it began the process of looking for a company to merge with.

4.     Astra's functional predecessor ("Legacy AS") was founded in October 2016. Leading up to the Merger, Defendants touted Legacy AS's business prospects and plan to purportedly create a mass-produced portable launch system.

5.     While Legacy AS touted its historical speed to reach space and business opportunities that positioned Legacy AS to achieve its ultimate goal to expand its launch and space services, its actual business and prospects were significantly exaggerated.

6.     On February 2, 2021, Defendants announced that Holicity entered into a business combination agreement with Legacy AS and a wholly-owned merger subsidiary of the Company to effectuate a merger. The Merger was consummated on June 30, 2021. In connection with the Merger, Holicity agreed to acquire all of the outstanding equity interests of Legacy AS for approximately $2.03 billion in aggregate consideration, while Legacy AS shareholders would receive consideration in the form of shares of common stock of the post-Merger Astra.

7.     At the time of the Merger, Defendants Kemp, London, McCaw, Stanford, and Lehman were appointed as members of Astra's Board of Directors (the "Board"). Legacy AS thereafter became a wholly owned subsidiary of the Company and changed its name to "Astra Space Operations, Inc."

8.     While the Individual Defendants knew, or were highly reckless in not knowing, of significant issues with Legacy AS's purported strategy, credibility, and product designs and capacity, among other things, they nonetheless failed to disclose the existence or extent of the issues and instead caused and/or permitted the Company to issue false and misleading statements touting Legacy AS's addressable market, designs, launch capacity and business plans.

9.      This deception allowed the Merger to close on terms that were unreasonable and unfavorable to the Company and its shareholders, given the known yet undisclosed state of affairs at Legacy AS (the "Overpayment Misconduct").

10.     The truth emerged on December 29, 2021, when market researcher, Kerrisdale Capital released a report titled *Astra Space, Inc (ASTR): Headed for Dis-Astra* (the "Kerrisdale Report"), revealing a multitude of issues with Astra's touted business, prospects and true capabilities.

11.     On this news, the Company's stock price fell $1.10 per share or approximately 14% to close on December 29, 2021 at $6.61 per share.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company did not have the capacity to launch its vehicles "anywhere"; (2) Legacy AS and later Astra's purported addressable market was exaggerated; (3) the effectiveness and reliability of the Company's designs were overstated; (4) the Company's plans to diversify and undertake its broadband constellation plan were unrealistic and; (5) the Company failed to maintain adequate internal controls. As a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

13.     In further breach of their fiduciary duties, the Individual Defendants failed to correct these false and misleading statements and omissions of material fact, or ensure the Company had adequate internal controls to affect their disclosure, rendering them personally liable

4

to the Company.

14.     Likewise, Defendants Ednie and McCaw, breached their fiduciary duties to the Company by agreeing to and/or facilitating the Merger with Legacy AS on terms that were unreasonable to the Company given the known yet undisclosed truth concerning Legacy AS's state of affairs (the "Overpayment Misconduct"). Defendants Kemp, Brannon and Stanford who served as Legacy AS's leadership before the Merger, aided and abetted these breaches of fiduciary duty.

15.     In yet further breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

16.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and Chairman, its Chief Financial Officer ("CFO"),  and its former CFO to two federal securities fraud class action lawsuits pending in the United States District Court for the Eastern District of New York (the "Securities Class Actions"); the need to undertake internal investigations, the need to implement adequate internal controls; the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Company's board of directors (the "Board") cannot consider a demand to commence litigation

against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1); Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9; and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

19.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Astra common stock. Plaintiff has owned Company common stock since the beginning of the Relevant Period and continues to hold Asta common stock through the present.

### Nominal Defendant Astra

24.     Astra is a Delaware corporation with its principal executive offices at 1900 Skyhawk Street, Alameda, California. Astra common stock trades on the NASDAQ Global Select

6

Market ("NASDAQ") under the ticker symbol "ASTR."

**Defendant Kemp**

25.     Defendant Kemp is one of Legacy AS's founders and served as its CEO prior to the Merger. He currently serves as Astra's CEO and Chairman of the Board. According to the Company's Schedule 14A filed with the SEC on September 29, 2021 (the "2021 Proxy Statement"), as of August 30, 2021, Defendant Kemp beneficially owned 6,650 shares of Class A common stock and 27,095,633 of Class B common stock, representing 35.48% of total voting power and rendering Defendant Kemp a controlling shareholder of Astra. Given that the price per share of the Company's common stock at the close of trading August 30, 2021 was $9.49, Defendant Kemp owned approximately $257 million worth of Astra stock.

26.     On February 1, 2021, Defendant Kemp's annual base salary was increased to $600,000.

27.     The 2021 Proxy Statement stated the following about Defendant Kemp:

*Chris Kemp* is our co-founder, Chairman and Chief Executive Officer. Mr. Kemp leads the overall company strategy and direction. Mr. Kemp founded Astra in October 2016. Mr. Kemp previously served as the Chief Technology Officer of NASA IT. During his time at NASA from November 2007 until March 2011, Mr. Kemp developed cloud computing strategy for the United States Federal Government with the White House and founded OpenStack, an open infrastructure software platform, which is the largest and fastest growing open source project in history, in 2010. Mr. Kemp currently serves on the Board of Directors at Scalr, an information technology and services company, and has served in that role since April 2015. Mr. Kemp has also served as an advisor to Planet Labs, an aviation and aerospace company, since January 2013, and Ripcord, a computer software company, since October 2015. Mr. Kemp previously founded and served as the CEO of three venture-backed start-ups, all of which are now owned by public companies. Mr. Kemp studied Computer Engineering at the University of Alabama in Huntsville and currently teaches at Stanford University.

**Defendant Brannon**

28.     Defendant Brannon served as CFO for Legacy AF prior to the Merger and

continued in such capacity at the Company following the Merger.

29.     According to the 2021 Proxy Statement, Defendant Brannon's annual base salary as of February 1, 2021 is $400,000, excluding certain equity compensation Defendant Brannon is entitled to.

30.     The 2021 Proxy Statement stated the following about Defendant Brannon.

**Kelyn Brannon** serves as our Chief Financial Officer and has served in that role since December 2020. Ms. Brannon leads our finance, legal and people functions. Throughout her career, Ms. Brannon has served as the Chief Financial Officer for several companies in the information technology and software industries. Ms. Brannon previously served as the Chief Financial Officer at Asure Software from October 2017 until August 2020. She has also served as a self-employed Finance Executive Consultant from May 2015 to December 2020, through which she offered consultative services for board and audit committee presentations and corporate governance. Ms. Brannon was the Chief Financial Officer of Arista Networks, Inc. from July 2013 until April 2015. Prior to that, she was the Chief Financial Officer at Delivery Agent, where she prepared Delivery Agent for its Initial Public Offering.

**Defendant Ednie**

31.     Defendant Ednie served as Holicity's CFO and secretary prior to the Merger, after which he discontinued his positions with the Company.

**Defendant London**

32.     Defendant London is one of Legacy AS's founders and served as its Chief Technology Officer ("CTO") prior to the Merger. He currently serves as Astra's CTO and as a member of the Board. According to the 2021 Proxy Statement, as of August 30, 2021, Defendant London beneficially owned 29,143,555 of Class B common stock, representing 38.17% of total voting power and rendering Defendant London a controlling shareholder of Astra. Given that the price per share of the Company's common stock at the close of trading August 30, 2021 was $9.49, Defendant London owned approximately $276 million worth of Astra stock.

33.     On February 1, 2021, Defendant London's annual base salary was increased to

$400,000.

34.    The 2021 Proxy Statement stated the following about Defendant London:

**Adam London** is our co-founder, Chief Technology Officer and serves as one of our directors. Dr. London helped to found Astra in October 2016 and has served as the Chief Technology Officer and director since then. Dr. London leads our technology strategy and long-term product roadmap. Dr. London co-founded and served as a managing partner for Ventions, LLC, which was our predecessor company, from January 2005 until September 2016. While at Ventions, LLC, Dr. London spent 10+ years leading initiatives to miniaturize high-performance rocket technologies, supported by funding from the Defense Advanced Research Projects Agency, NASA, and other government agencies. Prior to founding Ventions, LLC and Astra, Dr. London served as an engagement manager at McKinsey & Company, where he focused on the automotive and manufacturing sectors. Dr. London holds a B.S., M.S. and Ph.D. in Aerospace Engineering from Massachusetts Institute of Technology, where his research culminated in the creation of a liquid-cooled chemical rocket engine smaller than a postage stamp.

**Defendant Flournoy**

35.    Defendant Flournoy has served as a Company director since August 2021. She also serves as Chair of the Nominating and Corporate Governance Committee.

36.    Defendant Flournoy is entitled to receive an annual retainer of $250,000 and an additional $10,000 for her position on the Nominating and Corporate Governance Committee.

37.    The 2021 Proxy Statement stated the following about Defendant Flournoy:

**Michèle Flournoy**, age 60, has served as one of the Company's directors since August 2021. Ms. Flournoy's career has spanned many roles in the Defense industry, ranging from research to advisory. She is the co-founder and managing partner of WestExec Advisors, a strategic advisory firm formed in early 2018. She previously served as the Under Secretary of Defense for Policy from February 2009 to February 2012, acting as principal advisor to the Secretary of Defense in the formulation of national security and defense policy, oversight of military plans and operations, and in National Security Council deliberations. She led the development of the Department of Defense's 2012 Strategic Guidance and represented the Department in dozens of foreign engagements, in the media and before Congress. Ms. Flournoy co-founded the Center for a New American Security ("CNAS"), a bipartisan think tank, in 2007 and serving as President until 2009. She returned to serve as the CEO of CNAS from July 2014 through December 2017. Ms. Flournoy is also the recipient of numerous honors and awards, and has edited and authored various works on a broad range of defense and national security issues. In addition,

Ms. Flournoy has also served on numerous business and advisory boards such as Booz Allen Hamilton, Spirit of America, The U.S. Naval Academy Foundation, CARE and the Honorary Advisory Committee of The Leadership Council for Women in National Security. Ms. Flournoy is also a former member of the President's Intelligence Advisory Board, the CIA Director's External Advisory Board, and the Defense Policy Board, and is currently a member of the Council on Foreign Relations and the Aspen Strategy Group, and is a Senior Fellow at Harvard's Belfer Center for Science and International Affairs. We believe Ms. Flournoy is qualified to serve as a member of the Board based on her extensive experience in the defense industry and as a co-founder of two respected and successful organizations.

**Defendant Lehman**

38.    Defendant Lehman has served as a Company director since June 2021. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2021 Proxy Statement, as of August 30, 2021, Defendant Lehman beneficially owned 6,250 of Class A common stock. Given that the price per share of the Company's common stock at the close of trading August 30, 2021 was $9.49, Defendant Lehman owned approximately $59,312 worth of Astra stock.

39.    Defendant Lehman is entitled to receive an annual retainer of $250,000 and an additional $20,000 for his position on the Audit Committee and $7,500 for his position on the Compensation Committee.

40.    The 2021 Proxy Statement stated the following about Defendant Lehman:

*Michael Lehman*, age 71, has served as one of the Company's directors since June 2021. Mr. Lehman has also served the University of Wisconsin in various capacities since March 2016, currently as Interim Chief Operating Officer of the Wisconsin School of Business, and previously as Special Advisor to the Chancellor, Interim Vice Provost for Information Technology, Chief Information Officer and Interim Vice Chancellor for Finance and Administration. He is also currently on the Board of MGIC Investment Corp. and has served in that role since 2001. He had previously been a consultant (2014-2016); Interim Chief Financial Officer at Ciber Inc., a global information technology company (2013-2014); Chief Financial Officer of Arista Networks, a cloud networking firm (2012-2013); and Chief Financial Officer of Palo Alto Networks, a network security firm (2010-2012). Earlier in his career, he was the Executive Vice President and Chief

Financial Officer of Sun Microsystems, Inc., a provider of computer systems and professional support services. Mr. Lehman is qualified to serve as one of the Company's directors due to his financial and accounting knowledge gained through his service as chief financial officer of a large, multinational public company; his skills in addressing the range of financial issues facing a large company with complex operations; his senior executive and operational experience; as well as his technology and cybersecurity experience.

**Defendant McCaw**

41.     Defendant McCaw has served as a Company director since June 2021. He also served as Holicity's Chairman and CEO since June 2020. He currently serves as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, as of August 30, 2021, Defendant McCaw beneficially owned 7,900,484 of Class A common stock, representing 1.03% of total voting power. Given that the price per share of the Company's common stock at the close of trading August 30, 2021 was $9.49, Defendant McCaw owned approximately $74.9 million worth of Astra stock.

42.     According to the 2021 Proxy Statement, Defendant McCaw is entitled to receive an annual retainer of $250,000 and an additional $5,000 for his position on the Nominating and Corporate Governance Committee.

43.     The 2021 Proxy Statement stated the following about Defendant McCaw:

*Craig O. McCaw*, age 72, is an industry pioneer, visionary investor, serial entrepreneur and deeply experienced operator. Mr. McCaw has been Chairman and Chief Executive Officer of Holicity since June 2020. He is also Chairman and Chief Executive Officer of Colicity (NASDAQ: COLIU) since February 2021. Mr. McCaw has been Chairman of Pendrell since 2000, where he acted as Executive Chairman from 2014 to 2018 and currently acts as Co-Chief Executive Officer since October 2018. Mr. McCaw has also served as Chairman and Chief Executive Officer of Eagle River Inc. since June 1993, President of COM Investments LLC since December 1997, and President of COM Family Foundation since 1998.

Since October 2010, Mr. McCaw has served on the board of directors, including as former Chairman, of The Nature Conservancy. Mr. McCaw currently serves as a Member of the Climate Leadership Council, a Board Member of the Horatio Alger Association and a Global Advisory Board Member of the Khan Academy. From

2018 to 2021, Mr. McCaw served as a Member of the Advisory Board for Project LOON, a former subsidiary of Alphabet (NASDAQ: GOOGL). From 2014 to 2018, Mr. McCaw was a Member of the Harvard Business School Board of Deans Advisors.

Throughout his career of over five decades, Mr. McCaw started and built many companies in the cable, cellular telephone and wireless broadband industries. Mr. McCaw was Chairman and Chief Executive Officer of McCaw Cellular Communications, which he built into the nation's leading provider of cellular services before its sale to AT&T in 1996. Following the sale of McCaw Cellular, Mr. McCaw restructured Nextel Communications and later founded Nextel International and co-founded Nextel Partners. He also founded NEXTLINK Communications in 1994, later renamed XO Communications, where he served as Chief Executive Officer and as a Director. In 2003, Mr. McCaw co-founded and served as Chairman and Chief Executive Officer of Clearwire Corporation, a wireless broadband company. Mr. McCaw is a graduate of Stanford University.

We believe Mr. McCaw is qualified to serve as one of our directors due to his extensive business experience and expertise, and his ability to identify key business opportunities for significant growth.

**Defendant Nelson**

44.     Defendant Nelson has served as a Company director since August 2021. She also

serves as a member of the Audit Committee.

45.     Defendant Nelson is entitled to receive an annual retainer of $250,000 and an

additional $10,000 for her position on the Audit Committee.

46.     The 2021 Proxy Statement stated the following about Defendant Nelson:

*Lisa Nelson*, age 45, has served as one of the Company's directors since August 2021. Ms. Nelson has extensive knowledge and depth of experiences both as a strategic and operational leader and has developed valuable perspective in matters of digital transformation, business growth strategy and risk management. Ms. Nelson has served in different management positions at several Global 500 companies around the world. Ms. Nelson was most recently at Microsoft from August 2005 to October 2019 where she held executive roles across corporate accounting, investor relations, finance and business development. While at Microsoft, Ms. Nelson co-founded Microsoft's first venture fund, M12, and served as Managing Director for three years before retiring from Microsoft. Following her retirement from Microsoft, she has served as an advisor and director to a number of global businesses and charitable organizations. Currently, she is a member of the board of directors of the following organizations: Transforming Age (since July 2020), DNA Seattle (since June 2021) and Kuelap Inc. (since June 2021). She also

serves on the advisory boards of Flying Fish Partners (since July 2020), Movac, a venture capital fund in New Zealand (since July 2020), Brooks Running (since January 2021), amongst others. She is also Edmund Hillary Fellow.

**Defendant Stanford**

47.     Defendant Stanford has served as a Company director since June 2021, and previously served on the Board of Legacy AS since 2017. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee. According to the 2021 Proxy Statement, as of August 30, 2021, Defendant Stanford beneficially owned 29,656,192 of Class A common stock, representing 3.88% of total voting power. Given that the price per share of the Company's common stock at the close of trading August 30, 2021 was $9.49, Defendant Stanford owned approximately $281.4 million worth of Astra stock.

48.     According to the 2021 Proxy Statement, Defendant Stanford is entitled to receive an annual retainer of $250,000 and an additional $15,000 for his position on the Compensation Committee and $10,000 for his position on the Audit Committee.

49.     The 2021 Proxy Statement stated the following about Defendant Stanford:

*Scott Stanford*, age 51, has served as a member of the Board since December 2017. Mr. Stanford has served as the co-founder of several companies, including ACME, LLC and its affiliates, a venture capital firm, since February 2013; and Silicon Foundry, a membership-based corporate advisory platform, since February 2013. Prior to these roles, Mr. Stanford served as a managing director at Goldman Sachs from June 2004 until February 2013. Mr. Stanford also serves as a member of the board of directors of several private companies, including Cue Health Inc., a health technology company, since December 2017; Curology, Inc., a direct to consumer prescription skincare company, since September 2015; Luka, Inc., an artificial intelligence and software development company, since April 2016; and BFA Industries (formerly known as ipsy) a personalized beauty commerce company, since September 2015. Mr. Stanford holds an MBA from Harvard Business School. We believe Mr. Stanford is qualified to serve as a member of the Board based on his experience as a director of multiple technology and healthcare companies. We believe Mr. Stanford is qualified to serve as a member of the Board based on his experience as a director of multiple technology and healthcare companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

51.     Each controlling shareholder, director, and officer of the Company owed the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors, and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53.     To discharge their duties, the controlling shareholder, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.     Each Individual Defendant, by virtue of their position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and officers of

the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

55.     As controlling shareholders, senior executive officers, and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

56.     To discharge their duties, the controlling shareholders, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers, and directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Astra's own Code of Business Conduct and Ethics ("Code of Conduct");

15

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.     Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

58.     At all times relevant hereto, the Individual Defendants were the agents of each other and/or of the Company and were at all times acting within the course and scope of such agency.

59.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

60.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act; (ii) conceal

adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

63.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is or was a director of the Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

## ASTRA'S CODE OF CONDUCT

### *Code of Conduct*

65.     Astra's Code of Conduct opens by stating that it "provides a general statement of the expectations of Astra Space, Inc. (the "Company") regarding the ethical standards that each director, officer and employee should adhere to while acting on the Company's behalf."

66. The Code of Conduct further provides that it was adopted by the Board to "deter wrongdoing" and promote the following:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC"), and in other public communications made by the Company;

- compliance with applicable governmental laws, rules and regulations;

- the prompt internal reporting of violations of this Code to an appropriate person or persons identified herein; and

- accountability for adherence to this Code.

67. Regarding "Reporting Violations" the Code of Conduct states:

If you know or reasonably believe that there has been a violation of this Code or any illegal behavior has occurred, you must report the violation to your supervisor or to the General Counsel or his or her designee.

Any supervisor who obtains information about a Code violation has the responsibility to report the matter immediately to the General Counsel or his or her designee. No employee who in good faith reports a Code violation will be retaliated against or will otherwise be discriminated against in the terms and conditions of his or her employment.

68. Regarding "Conflicts of Interest," the Code of Conduct states:

Directors, officers and employees should avoid activities that create or give the appearance of a conflict of interest between their personal interests and the Company's interests. A conflict of interest exists when a personal interest or activity of a director, officer or employee could influence or interfere with that person's performance of duties, responsibilities or commitments to the Company.

69. The Code of Conduct makes clear the importance of maintaining accurate Company records stating, among other things:

The Company's business affairs are also subject to certain internal and external disclosure obligations and recordkeeping procedures. As a public company, we are committed to abiding by our disclosure obligations in a full, fair, accurate, timely

19

and understandable manner. Only with reliable records and clear disclosure procedures can we make informed and responsible business decisions. When disclosing information to the public, it is our policy to provide reliable and accurate information. To maintain reliability and accuracy, specific Company spokespersons are designated to respond to questions from the public. Only these individuals are authorized to release information to the public at appropriate times. All inquiries from the media or investors should be forwarded immediately to the Chief Executive Officer, the Chief Financial Officer or their respective designees. The Chief Financial Officer and the General Counsel must approve all press releases, speeches, publications or other official Company disclosures in advance. Our internal control procedures are further regulated by the Sarbanes-Oxley Act of 2002. The Sarbanes-Oxley Act of 2002 was a U.S. legislative response to events at public companies involving pervasive breakdowns in corporate ethics and internal controls over financial reporting. It was designed to rebuild confidence in the capital markets by ensuring that public companies are operated in a transparent and honest manner. Ensuring proper and effective internal controls is among the Company's highest priorities.

70.     The Code of Conduct also contains provisions related to the "Proper Use of Corporate Assets[.]" The Code of Conduct states: "The Company's assets shall be used for their intended business purposes. Personal use of the Company's funds or property, including charging personal expenses as business expenses, inappropriate reporting or overstatement of business or travel expenses and inappropriate usage of Company equipment or the personal use of supplies or facilities without advance approval from an appropriate officer of the Company shall be considered a breach of this Code."

71.     At a high level, the Code of Conduct states: "[w]e recognize the fact that, as participants in the fuel cell industry, we work in a heavily regulated industry. Adherence to regulatory compliance principles and procedures is among our highest priorities. We are committed to sharing helpful and accurate information about our products.

72.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, to facilitate and disguise the Individual

Defendants' violations of law, including breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and aiding and abetting thereof.  In further violation of the Code of Conduct and relevant corporate the Individual Defendants who worked at Astra failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Moreover, the Individual Defendants who worked at Astra failed to secure and/or disclose any waivers of the Code of Conduct granted by the Board, which constitutes a further violation of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

73.     Astra is an aerospace company whose stated mission is to launch a new generation of launch and space services and products to improve life on Earth. The Company purportedly utilizes satellites in LEO and aims to develop the first mass-produced system of small launch vehicles.

74.     Holicity was founded as a SPAC backed by major telecom billionaire, Defendant McCaw. The sole purpose of Holicity's existence was to effectuate a merger, capital stock exchange, acquisition, stock purchase, or engage in a comparable business arrangement with one or more businesses. Before the Merger, Holicity was a "shell" company that had no business operations, and its assets comprised mainly of cash only. Holicity's IPO closed in August 2020, after which it began the process of looking for a company to merge with and adopt the operations of. The operating company benefits from the business combination by getting access to investment

without undergoing the strictures of a formal IPO, and the SPAC and its shareholders benefit by having (ideally) more valuable shares from combining with a valuable target company.

75.     Astra's functional predecessor, Legacy AS, was founded in October 2016. Leading up to the Merger, Defendants touted Legacy AS's business prospects and plan to purportedly create a mass-produced portable launch system.

76.     While Legacy AS touted its historical speed to reach space and business opportunities that positioned Legacy AS to achieve its ultimate goal to expand its launch and space services, its actual business and prospects were significantly exaggerated.

**The Merger and the Overpayment Misconduct**

77.     On February 2, 2021, Defendants announced that Holicity entered into a business combination agreement with Legacy AS and Holicity Merger Sub Inc., a wholly-owned merger subsidiary of the Company to effectuate a merger whereby Astra would continue as the surviving company and Legacy AS would continue as a wholly-owned subsidiary of Holicity. Defendants Kemp, London, McCaw, Stanford and Lehman were appointed to serve as directors on the Board following the close of the Merger.

78.     As noted above, the Merger closed on June 30, 2021. Legacy AS, which became a wholly owned subsidiary of the Company, changed its name to "Astra Space Operations, Inc." and Holicity adopted Legacy AS's prior name, "Astra Space, Inc."

79.     Per the terms of the Merger, *inter alia*, Holicity agreed to acquire all the outstanding equity interests of Legacy AS for approximately $2.03 billion in aggregate consideration. Legacy AS shareholders also received consideration in the form of shares of common stock of the new Company.

80.    These terms were unfavorable and unreasonable to Holicity shareholders, given that Legacy AS was a less valuable acquisition than Holicity shareholders were led to believe.

**False and Misleading Statements**

***February 2, 2021 Press Release and Investor Presentation***

81.    On February 2, 2021, the Company issued a press release attached to a current report on Form 8-K signed by Defendant Ednie and filed with the SEC the same day. The press release, titled "Astra to become the first publicly traded space launch company on NASDAQ via merger with Holicity [,]" announced the intended business combination and maintained that, "'This transaction takes us a step closer to our mission of improving life on Earth from space ***by fully funding our plan to provide daily access to low Earth orbit from anywhere on the planet***,' said Chris Kemp, Founder, Chairman and CEO of Astra." (Emphasis added.)

82.    The current report also attached an investor presentation that contained the following slides boasting of Legacy AS's capacity to "Launch anywhere in the world in 24 hours," the timeline to purportedly "hyperscale space operations," and the future Company's addressable market:












*June 7, 2021 Press Release*

83.   On June 7, 2021, the Company issued a press release attached to a current report

on Form 8-K signed by Defendant Ednie and filed with the SEC the same day. The press release,

titled "Astra Acquires Apollo Fusion to Reach New Orbits [,]" discussed Legacy AS's acquisition

of Apollo Fusion, Inc. as follows:

> Astra, the fastest privately funded company in history to reach space, announced today its planned acquisition of Apollo Fusion in a transaction valued up to $145 million. ***Apollo Fusion manufactures a leading electric propulsion engine. This acquisition allows Astra to provide launch and space services beyond low Earth orbit (LEO), to medium Earth orbit, geosynchronous, and lunar orbits***.
>
> "In addition to increasing Astra's total addressable market for launch services, the acquisition of Apollo Fusion accelerates Astra's ability to efficiently deliver and operate spacecraft beyond low Earth orbit," said Astra Founder, Chairman, and CEO Chris Kemp.
>
> * * *
>
> "Propulsion systems open new destinations," said Apollo Fusion Founder and CEO Mike Cassidy. "Our team is excited to combine the flexibility of in-space propulsion with the world's most responsive launch provider." [Emphasis added].

***2021 Proxy Statement***

84.    On September 7, 2021, the Company filed the 2021 Proxy Statement with the SEC.

Defendants Kemp, London, Flournoy, Lehman, McCaw, Nelson, and Stanford solicited the 2021

Proxy Statement, which contained material misstatements and omissions.

85.    The 2021 Proxy Statement asked Company shareholders to vote, *inter alia*, to: (1)

elect Defendants Kemp and London to serve until the 2024 annual meeting of shareholders; (2) to

ratify the appointment of Grant Thornton LLP as Astra's independent auditor; and (3) to transact

other business that may come before the meeting.

86.    The 2021 Proxy Statement said of the "Role of Board in Risk Oversight Process"

that:

> Our Board has an active role, as a whole and also at the committee level, in overseeing the management of our risks. Our Board is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks and operational risks. The compensation committee is responsible for overseeing the management of risks associated with our compensation policies and practices. The audit committee is responsible for overseeing the management of risks relating to accounting matters and financial

reporting. The nominating and corporate governance committee is responsible for overseeing the management of risks associated with potential conflicts of interest. Although each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through discussions from committee members about such risks. Our Board believes its administration of its risk oversight function has not negatively affected our Board's leadership structure.

87. The 2021 Proxy Statement also said the following about the Company's Code of

Conduct:

We have adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers and directors, including our principal executive officer, principal financial officer and principal accounting officer. The Code of Business Conduct and Ethics is available on our website at www.investor.astra.com. In addition, we will post on our website all other disclosures that are required by law or the listing standards of Nasdaq concerning any amendments to, or waivers from, any provision of the code and policy.

88. Moreover, the 2021 Proxy Statement said the following regarding Astra's

compensation program:

The objective of the Company's compensation program is to provide a total compensation package to each NEO that will enable the Company to attract, motivate and retain outstanding individuals, align the interests of our executive team with those of our equity holders, encourage individual and collective contributions to the successful execution of our short-and long-term business strategies and reward NEOs for performance. The Board has historically determined the compensation for the NEOs.

89. The 2021 Proxy Statement was materially misleading because it failed to disclose

that: (1) contrary to the 2021 Proxy Statement's descriptions of the Board's and it committees'

risk oversight functions, the Board and its committees were not adequately exercising these

functions and were causing or permitting the Company to issue false and misleading statements

about it; (2) certain Individual Defendants were violating the Code of Conduct without obtaining

waivers or else without such waivers being disclosed; and (3) certain Individual Defendants,

including those soliciting the 2021 Proxy Statement, were breaching their fiduciary duties to the

Company and its shareholders and were thus improperly interested in receiving unjust compensation.

90.     The 2021 Proxy Statement was also materially misleading because it failed to disclose that: (1) the Company did not have the capacity to launch its vehicles "anywhere"; (2) Legacy AS and later Astra's purported addressable market was exaggerated; (3) the effectiveness and reliability of the Company's designs were overstated; (4) the Company's plans to diversify and undertake its broadband constellation plan were unrealistic and; (5) the Company failed to maintain adequate internal controls. As a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

91.     Due to the false and misleading elements of the 2021 Proxy Statement, Company shareholders voted, *inter alia*, to elect Defendants Kemp and London to the Board, allowing them to continue breaching their fiduciary duties to the Company.

### *October 22, 2021 10-Q/A*

92.     On October 22, 2021, the Company filed a quarterly report amendment on Form 10-Q/A with the SEC for the quarterly period ended June 30, 2021 (the "10-Q/A"). The 10-Q/A was signed by Defendants Kemp and London, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Brown and Nelson attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

93.     Regarding the Company's ability to launch vehicles "anywhere," its addressable

market, and its plans for diversification and broadband constellations, the 10-Q/A stated the

following:

> Our system consists of a small launch vehicle and mobile ground infrastructure that
> can fit inside standard shipping containers for rapid deployment anywhere in the
> world. Our rocket requires a launch site with little more than a concrete pad and
> only six Astra employees on-site, leveraging our highly automated launch
> operations, and our production system is designed to scale efficiently to hundreds
> of launches per year. Our rocket's payload capacity is tailored for the needs of
> modern LEO satellite constellations, allowing precise and rapid placement of
> individual satellites into their required orbits. We believe this makes Astra's system
> more responsive and affordable than other launch alternatives, for thousands of
> LEO satellites planned in the coming decade.

***November 11, 2021 Earnings Call***

94.     On November 11, 2021, the Company held a call to discuss Astra's third fiscal

quarter. When asked about the Company's relationship with one of its purported suppliers, Firefly

Aerospace Inc., Defendant Kemp maintained:

> So then finally, the question on the supplier. I think there were some articles online
> speculating a supplier. And I think I've discussed before, we don't discuss how we
> manufacture things or our suppliers publicly. But what I can tell you, and I will
> reiterate here, is that all intellectual property required to produce all of our
> technology will be owned, licensed or developed by Astra. And anything you've
> read is not inconsistent with this strategy. So I think that's all I can say about that
> at this point.

***November 15, 2021 10-Q***

95.     On November 15, 2021, the Company filed a quarterly report with the SEC on Form

10-Q for the fiscal quarter ended September 30, 2021 (the "3Q 10-Q"). The 3Q 10-Q was signed

by Defendants Kemp and Brannon and contained SOX certifications by them confirming the

accuracy of the purported statements therein.

96.     The 3Q 10-Q stated the following about Astra's capacity to launch anywhere, its addressable market, its plan for diversification and broadband constellations, and the Apollo Fusion, Inc. acquisition:

> ***Our system consists of a small launch vehicle and mobile ground infrastructure that can fit inside standard shipping containers for rapid deployment anywhere in the world. Our rocket requires a launch site with little more than a concrete pad and only six Astra employees on-site, leveraging our highly automated launch operations, and our production system is designed to scale efficiently to hundreds of launches per year.*** Our rocket's payload capacity is tailored for the needs of modern LEO satellite constellations, allowing precise and rapid placement of individual satellites into their required orbits. We believe this makes Astra's system more responsive and affordable than other launch alternatives, for thousands of LEO satellites planned in the coming decade.
>
> […] ***On November 4, 2021, we announced the filing of an application with the Federal Communications Commission for V-band spectrum access, which, if approved, would allow us to offer a satellite constellation in the future.***
>
> * * *
>
> On November 4, 2021, we filed an application with the Federal Communication Commission, under which we requested authority to launch and operate a nongeostationary orbit satellite system using ***V-band frequencies (the "Constellation") as we work to build out our Space Services offering to enable communications***.
>
> * * *
>
> **Lowering Manufacturing Costs and Increasing Payloads** …
> We plan to increase the maximum payload capability of our rockets from approximately 50 kg for our first commercial flight to up to 500 kg for a mid-inclination 500 km orbit, which we believe will make Astra a compelling option for low Earth orbit constellation deployment and replenishment. Our affordable manufacturing processes use normally readily available materials and are highly scalable, while we believe our ongoing improvements in design and manufacturing will further reduce our per rocket manufacturing costs.
>
> * * *
>
> **Acquisition of Apollo Fusion**
> On July 1, 2021, the Company completed its acquisition of Apollo Fusion, Inc. ("Apollo"), a designer and builder of thruster propulsion systems for satellite programs.

(Emphasis added.)

30

97.    The statements contained in ¶¶ 81-83, 92-96 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the Company did not have the capacity to launch its vehicles "anywhere"; (2) Legacy AS and later Astra's purported addressable market was exaggerated; (3) the effectiveness and reliability of the Company's designs were overstated; (4) the Company's plans to diversify and undertake its broadband constellation plan were unrealistic and; (5) the Company failed to maintain adequate internal controls. As a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

98.    On December 29, 2021, Kerrisdale Capital published the Kerrisdale Report, revealing significant issues that plagued Astra and Legacy AS.

99.    The Kerrisdale Report discredited Astra's claims that it could launch vehicles anywhere, stating in relevant part:

> Management habitually describes Astra as having the flexibility to launch from "anywhere in the world," which is simply not true. Just because a rocket can be transported in a shipping container – doesn't mean one can lift off from any Walmart parking lot. In the US, Astra can only launch from an FAA-licensed commercial spaceport approved for vertical launch. There are only 5 such sites (plus SpaceX's private Boca Chica spaceport) located in the U.S. 97% of launches over the last 40 years have been from only 2 launch sites: Cape Canaveral spaceport (30 launches in 2020) and Vandenberg Space Force Base (1 launch in 2020). For a company aiming to launch hundreds of rockets per year, the reliance on a small handful of key spaceports is a bottleneck that threatens its whole business model. While there are ongoing modernization efforts at Cape Canaveral and the FAA is streamlining launch licensing requirements, these efforts can get bogged down in bureaucratic quagmires.

> Due to the fact vertical launch vehicles drop one or more stages downrange, *creating a hazard to life and property in the drop zones, vertical launches must take place near bodies of water (like Cape Canaveral) or in remote locations (Spaceport America, adjacent to White Sands Missile range in New Mexico).*

* * *

Perhaps in recognition of the challenge in finding sufficient domestic spaceport access, the company has described working hard to secure launch sites internationally. International space agencies, trade groups, and regulatory bodies are working on various fronts to improve spaceport availability, but these efforts generally lag that of the US and have encountered their own challenges from local politicians and environmentalists. ***How and if a US company with a US rocket would be granted approval – when many countries typically assign preference to supporting their own member nation launch programs – is also uncertain***. With so much focus on scaling manufacturing processes and launch cadence, the seemingly mundane issue of finding somewhere to launch is a risk to Astra's long-term vision because contrary to management's oft repeated claim – ***Astra can't launch from anywhere.***

(Emphasis added.)

100.    The Kerrisdale Report further disclosed that the Company's assumptions about its projections and addressable market were, among other things, "absurd" stating that:

Astra's investor pitch boils down to selling the pipedream of an unprecedented number of cheap rocket launches. Astra's forecast calls for 300 launches per year by 2025, a whopping 10x more than SpaceX achieved in 2021. Management markets this exceptionally aspirational goal (which we view as pure fantasy) in a bid to spread its expensive Bay Area manufacturing costs over enough rockets in order to turn a profit. A reality check is in order: To date, Astra has managed just one successful orbital test flight. If Astra's five-year projection of almost daily successful launches of rockets made with non aerospace grade parts does not sound improbable enough, it ignores an even graver problem with Astra's projection – not one expert whom we interviewed, nor any independent market study we reviewed, offered any reason to think that, industry-wide, sufficient market demand will exist for Astra to sustain approximately daily launches by 2035, let alone 2025.

* * *

**Financial Projections Rely on Absurd Market Assumptions**
Astra's financial forecasts rely on launching an astounding 165 rockets by 2024 and 300 rockets by 2025. ***To put these figures in context, 300 launches is 10x the total number of US commercial launches in 2022. 300 is nearly triple the total number of launches conducted globally in 2020.*** Incredibly, despite the obvious engineering, manufacturing, logistical, and regulatory challenges hitting such a cadence would represent, Astra felt it appropriate to issue this outlook before successfully reaching orbit even once.

**Planned Daily Launch Cadence Far Exceeds Addressable Market**

[…] Astra touted big picture themes like "$1 trillion+ Total Space Economy in 2040" (from Morgan Stanley), and a misleading slide that shows a large increase in the cumulative number of satellites to be launched in the coming years, but without specifying Astra's niche role in this economy and the true addressability for a rocket with only a 500kg payload capability (eventually). It's a significant red flag with a simple explanation: every legitimate market study that Astra could include would only show its projections to be laughably unrealistic – so Astra just left them out.

* * *

Below we walk through an analysis to determine a more refined view of the market opportunity for Astra as it strives to establish daily launch in 2025. We begin with NSR's estimate of the total number of non-GEO satellites to be launched in 2025 (2,255). We then apply two simple filters: 1) we exclude 90% or 851 of NSR's North American communications satellites forecast to account for Starlink (SpaceX launched 850 Starlink satellites in 2020), 2) we deduct 90% of satellites from Asia and 20% from Europe based on the contribution to these regions from Chinese and Russian satellites.

## Astra 2025E Launch TAM

| | 2025E |
|---|---|
| Total Non-GEO Satellite Launches | 2,255 |
| Less: NA Communications | (851) |
| Less: 90% Asia (China) | (792) |
| Less: 20% of Europe (Russia) | (25) |
| Total Addressable Non-GEO Satellites | 587 |

Source:  Kerrisdale analysis and Northern Sky Research, Global Satellite Manufacturing and Launch Markets 11th Edition, July 2021.

At less than 600 satellites, the entire non-captive TAM for launch is easily supported by less than 100 total launches. SpaceX rideshare recently set a record for 134 satellites on a single mission. *Juxtapose a potential addressable market of less than 100 launches in aggregate, with Astra's projection of conducting 300 launches themselves when there are dozens of competitors, and one can see why our conversations with a range of industry participants yielded the following comments regarding Astra's plans*:

"***I laugh at that number . . . . There's no way they are doing 300 launches by 2025; by 2035 it would still be a stretch***." — Senior Engineer, launch broker

"We are, all around in the industry, in the same spot. ***Even within Astra and at [our small launch company], I'm looking at [1/10th Astra's number] rockets, and we are freaking out – are we really going to have enough customers for this?***" — Senior Engineer, small launch provider

"Happy they got to orbit on last launch a few weeks ago, that's great, but ***there's just a lot of issues with their rocket and their business model***…claims of launching every day? It's pretty exciting when a launch provider can launch once a month – and sure, ***everyone would love for rockets to be like airplanes – that's not going to happen for at least another decade***. So yes, I have some serious concerns about Astra's claims." — Mission Manager for a broadband mega-constellation … We believe there will always be some level of interest in a service that can regularly/flexibly bring a handful of smallsats to a specific orbital location, even at a premium price to rideshares – but that is a niche offering in a highly competitive field. ***It is not an addressable market that comes anywhere near supporting 300 launches per year for a single company with Astra's limited capabilities***.

\* \* \*

This is because ***while satellite volumes are increasing, launch pricing is under constant deflationary pressure (the latter is enabling the former).***

***Competition from new entrants and from larger rideshare players lowering price, cost efficiencies from reusable launchers, and improvements in technology and operations all conspire to exert downward pressure on price***. Taken together, we estimate a total launch market value that averages ~$13bn per year over the next several years, with a whopping 85% accounted for in constellations, where larger launch vehicles enjoy economies of scale, leaving an annual TAM for a small launcher like Astra in the $~2 billion dollar range. Astra's 2025E launch revenue forecast of $1.125bn assumes it can hold ASP constant at $3.75m and rise in 4 years to become the dominant player in the small launch market. Either NSR is too pessimistic (which anyone who has followed the industry knows is not usually how industry projections work) or, as we would contend, the projections of a new space SPAC, announced at the height of the bubble (two days before Virgin Galactic hit its all-time high of $62) is complete fantasy.

***Without High Launch Cadence, Astra's Business Model Falls Apart […] The problem lies in the unit economics of launch. […]***

\* \* \*

***Investors should be asking whether Astra devised a launch cadence to meet market demand or to merely solve for the inherent weaknesses in its business model?*** Our research, supported by a range of interviews with key industry

players, point strongly to the latter. ***Astra took full advantage of the lack of scrutiny SPACs enjoyed earlier this year relative to traditional IPOs, passed off a launch cadence without any supporting market demand, and sold equity in a bubble that has now burst.*** As a launch services broker with direct insight into market trends on a global basis described, "we get it, it was a cash grab…but how are you not going to squander all this money? Astra is all show and it's not clear where they're going to go aside from just building a bunch of stuff."

(Emphasis added.)

35. The Report stated the following regarding the Company's designs:

Its main competitors will soon be launching larger 1,000kg+ payload rockets while Astra has yet to overcome developmental hurdles necessary to successfully launch even a single satellite into any of the emerging broadband mega constellations. Shortly after Astra announced its SPAC merger, the company increased its payload capacity goal (not a trivial matter in rocket programs) and signed a "secret" deal with a competitor for access to some of the competitor's more powerful engine IP – both clear signs that Astra is struggling to keep pace with market leaders. Moreover, Astra shortsightedly relies on cheap, off-the-shelf commercial parts – a strategy that precludes it from exploiting the economic advantages that its more sophisticated competitors enjoy by developing reusable rockets that in the long run reduce expenses. Consequently, Astra remains strikingly vulnerable to the relentless price deflation that characterizes today's launch market.

\* \* \*

**Undersized and Not Reusable: Astra is Falling Behind Industry Trends**

Not only is the overall addressable market Astra has promoted vastly overstated – Astra's development path is on the wrong side of key trends within the industry: larger payloads and reusability.

Most of the increase in mass-to-orbit in the coming decade will be as part of large broad band constellations. According to NSR, nearly 80% of all non-GEO satellites from now until the end of the decade will be part of constellations of communications smallsats. Smallsat manufacturers are taking advantage of declining launch costs to build larger, more sophisticated constellations of satellites which generally have more mass than previous iterations.

\* \* \*

Now examine Astra's development path and some of the changes it has announced only months into being a public company. At the time of the SPAC announcement 10 months ago, Astra's stated goal was a 300kg payload to 500km Sun-Synchronous Orbit by 2023. By 2025, it hoped a vehicle that can "throw about 300 kilograms to a reference orbit" would be launched daily. Only 3 months later

however, in conjunction with the Planet launch agreement, Astra announced a new goal: 500kg to 500km LEO. Why the sudden change? Because according to experts in the industry, management likely knew that to make good on claims that Astra could "meet the needs of all these mega-constellations like Kuiper", it needed a rocket with more than just a 300kg payload.

***Announcing a 66% jump in payload capacity is not a trivial matter in rocket development.*** It involves meaningful redesign work with new components and a more powerful engine – one that apparently Astra did not have. As a sign of Astra's unpreparedness, four months after the new 500kg objective, ***Astra signed a "secret" deal to purchase the IP for an engine powerful enough to launch this new 500kg payload from its competitor, Firefly Aerospace (more on this later).***

Even with this shortcut, Astra will still only have a rocket two years from now that is able to launch 1 Project Kuiper satellite, barely 2 Project Pelican satellites from Planet, and zero Gen2 Starlink satellites.

* * *

In addition to higher payloads, rockets that are partially or fully reusable continue to lower the cost profile of the launch industry. In the conference call announcing Astra's SPAC merger, management claimed the unit economics of mass manufacturing small rockets could match that of a large rocket. Below we walk through how that falls apart once one factors in the marginal cost of SpaceX's reusable Falcon 9 and planned Starship.

### Marginal Cost Benefit of Reusable Rockets

| | ★ ASTRA | Reusable | Marginal Cost | |
| | Rocket 5 | Falcon 9 | Falcon 9 | Starship |
|---|---|---|---|---|
| BOM + Labor Cost ($ M) | $1 | $28 | $15 | $2 |
| Payload to LEO (kg) | 500 | 13,680 | 13,680 | 100,000 |
| $/kg Production Cost | $2,000 | $2,047 | $1,096 | $20 |
| Timeframe | 2025 | Now | Now | 2022/23 |

Source: *Astra investor presentations, public comments from* Elon Musk, *Kerrisdale Analysis.*

[…] After the maiden voyage however, Musk has stated the marginal cost of refurbishing and launching a reusable Falcon 9 drops to only $15m. Applied against a 13,680kg payload, (a reduction of 40%) to account for the reusability of the booster and fairing, and now the incremental cost of production is nearly half that of Astra's target for 2025. The cost advantage for a re-used Starship is even more dramatic. Musk has outlined the possibility Starship may fly for a marginal cost of just $2m, a staggering $20/kg, orders of magnitude cheaper than anything Astra can hope to achieve (even if one discounts Musk's hyperbolic tendencies).

Other small launchers in the industry are following SpaceX's path to capture these economics. Rocket Lab's Electron is being evolved to become partially reusable using parachutes and mid-air recapture, while its Neutron rocket will be partially reusable thanks to propulsive landing. Relativity Space aims to start flying a fully re-usable, 3D-printed Terran R rocket in 2024. VC start-ups like STOKE are developing reusable rockets. Astra on the other hand, a company with a corporate slogan of "Improve life on Earth from Space," and a CEO with a "vision of a healthier" planet has no path to developing a reusable rocket, and apparently does not see a problem with having hundreds of rockets land in the ocean every year.

* * *

**"Secret" Firefly Engine Deal is Sign of Weakness**
On September 21, the tech blog TheVerge.com, reported that Astra agreed to acquire the right to manufacture rocket engines in-house from launch competitor, Firefly Aerospace, for roughly $30m. The article references internal Firefly documents viewed by the publication and includes specifics which suggest the agreement was leaked by Firefly. Though Astra's CEO and VP of Communications declined to comment on certain specifics of the agreement, neither disputed its existence (there is no mention of this material agreement in Astra's SEC filings and no press releases were ever issued by either company). When asked on the last quarterly call about the reported Firefly relationship, management once again did not disclaim the existence of the agreement, stating that anything the analyst had read online was "not inconsistent" with a strategy of all technology being "owned, licensed, or developed by Astra.

***So why the cloak and dagger? Perhaps Astra is aware that buying the IP for the most critical piece of hardware on a rocket from a direct competitor is not exactly a good look***. …

Unsurprisingly, when doing a deal with a competitor, the agreement has some important restrictions. ***The IP agreement allegedly includes a clause that only allows Astra to use two Reaver engines per rocket – enough to hit Astra's goal of 500kg to 500km – but no more. Recall that Firefly is developing a 630kg- 1,000kg rocket, and therefore the agreement caps Astra's use of the IP just below Firefly's***

37

> *capability and the emerging sweet spot for smaller launchers. Firefly seems content to help Astra for a price – but it isn't foolish enough to solve a direct competitor's problem of being undersized.*

(Emphasis added.)

101.    Commenting further on Astra's issues with reliability and quality, the Kerrisdale Report maintained:

> **Ignoring Reliability Issues is a Risky Game**
> Conversations with an individual familiar with Astra's rocket design and manufacturing suggest investors may have to endure an uncomfortably high rate of failure as the company ramps to a targeted monthly launch cadence in 2022. Astra has previously stated "we're actually not shooting for 100 percent reliability" and is willing to trade a small amount of reliability for cost savings. Note that, ***despite "accepting less than 100%" reliability, Astra's financial projections as presented during the SPAC process assume zero failures (naturally).***
>
> CEO Chris Kemp has said an 80% success rate is a level Astra internally deems acceptable, substantially lower than the high 90s of far more sophisticated launch programs. ***This rate is an aspirational goal as the company continues to test and refine manufacturing, not the company's current level of anticipated quality. At the current stage of Astra's development, our source believes the risk of failure is as high as 1 in 2 launches.***
>
> The stakes are now substantially higher. ***Astra is trying to develop reliability of a cheap rocket, built without any redundancies, under the scrutiny of public markets to which it needs continued access.***

(Emphasis added.)

102.    Finally, the Kerrisdale Report wholly discredited Astra's purported plans for diversification and broadband constellations:

> **Space Services Strategy Lacks Clarity and Credibility**
> In June, Astra announced the acquisition of Apollo Fusion, a manufacturer of electric propulsion engines for small satellites, in a transaction valued up to $145m ($30m in stock, $20m in cash, and an additional $95m in potential earnouts).
> The acquisition is part of a broader trend within the industry to move beyond just launch services to higher margin, in-space sources of revenue. As Firefly CEO Tom Markusic explained, "the rocket gives you the keys to space. It's critically important, but the big revenue is doing things in space." The need for this diversification is driven by the fact that while launching rockets to the heavens can be an awe-inspiring event – as an actual business there's not a lot to be excited

about. *At its core, building and launching rockets is a risky, capital intensive, non-recurring, low-margin hardware business. Greater profits (and valuations) lie in moving up the value chain to develop turnkey "space solutions", orbital transport vehicles, and operating constellations.*

\* \* \*

The problem with a small launcher that wants to provide greater service in space is everyone has the same idea. Making orbit transfer vehicles (OTVs) that facilitate "last mile" delivery of a satellite to a specific orbit or moving beyond LEO to MEO [medium Earth orbit], GEO [geosynchronous orbit] and lunar orbits is a crowded field. Our research yielded no fewer than 10 domestic launch providers, component suppliers, rideshare aggregators, and smallsat propulsion manufacturers that have OTVs in development with launch dates over the next 3 years, and another 8 internationally. The prospects for developing a successful broadband constellation is even more challenging. *Astra's crazily ambitious Vband constellation is years behind Starlink, OneWeb, and Project Kuipe without any of the technical and financial resources, and without a business case that justifies the bootstrapping of yet another broadband megaconstellation*. Taken together, Astra's acquisition of Apollo Fusion and V-band spectrum application are uninspired attempts at mimicking the strategies of more advanced competitors which underscore the limitations of its undersized rocket in providing in-space solutions.

*An engineer we spoke with who is familiar with Apollo Fusion's history stated the company originally generated excitement within the propulsion community for a system using iodine as a propellant.* The technology didn't work as hoped and within a couple years Apollo transitioned to using Mercury, a low pressure propellant used in thrusters since the 1960's. Just like iodine, Mercury is toxic, and after the idea of working with a dangerous neurotoxin before showering into the atmosphere was (thankfully) reconsidered, it too was discontinued in favor of Apollo's current propulsion system based on Xenon and Krypton – propellants that nearly everyone in the propulsion industry has been using for decades. *As the expert explained, "[Apollo Fusion] is a company that has made claim 1 and failed, made claim 2 and failed, and is now building something that everyone else has been building forever."* Without any proven technological differentiation, the only way to win business is price, a market position which puts a dent in the strategy of "moving up the value chain."

*Astra's acquisition of Apollo Fusion is an example of a company making decisions based on what it must do given the limitations of its rocket – not what the market wants, and not what a company without such limitations would ever devise.* The right solution for an OTV would have been chemical propulsion but Astra couldn't go that route because of the bulkier dimensions of the system's propellant tanks. Under pressure to keep up with competitors, electric propulsion was simply the only option small and light enough to fit in Astra's rocket. *While others in the industry like Rocket Lab are developing well-suited, best-in-class technology, enabling a variety of TAM-expanding missions, Astra is settling for*

*suboptimal acquired technology with only niche applications.*

**Broadband Constellation Plan is a Pipedream**

\* \* \*

A few months after acquiring Apollo Fusion, Astra filed an application with the FCC to use V-band spectrum for a constellation of up to 13,620 satellites. V-band is high frequency spectrum that sits above Ka-band, from 40GHz-75GHz, and I sensitive to rain fade and physical interference. ***No ecosystem currently exists to support the use of V-band for space-based telecommunications***. As described by satellite communications expert, Chris Quilty of Quilty Analytics, "It's expensive, it's early stage, and there are limited sources of supply. I would argue that companies that are trying to build these components on their own are going to run into significant engineering challenges."

***It's worth pausing to note the absurdity of the FCC filing: Astra has never built a single satellite; it has not yet proven it can reliably execute on its core business of launching small rockets – and yet, it filed an application for a constellation 2x larger than the next largest proposal from Amazon***. While the application technically amounts to little more than a procedural "land grab" for spectrum rights, investors should be concerned about how and why a launch company still working out the kinks of rocket development would even contemplate the endeavor. Unsurprisingly, Kemp seems to want to avoid talking about the entire project.

\* \* \*

***And where would the money for any of this come from? Astra only has enough cash on hand to get through 2023 (maybe). Satellite manufacturing, terminal development, gateways, regulatory approval, landing rights . . . the list goes on and the costs are staggering.*** Musk has pegged Starlink total investment costs at between $20 and $30 billion, OneWeb went bankrupt, and Project Kuiper and Telesat are years behind schedule. ***We believe Kemp does not wish to discuss Apollo Fusion technology being used for an internal satellite bus or the development of an Astra constellation, because the enormity of the costs and equity dilution involved would send investors running for the hills.***

***Attempts to "expand TAM" through M&A and develop higher margin service revenue are a distraction when Astra hasn't even executed on its supposed core competency: launching rockets***.

(Emphasis added.)

103.    On this news, the price of the Company's common stock fell approximately 14%, or $1.10 per share, from closing at $7.71 per share on December 28, 2021, to close at $6.61 per

share on December 29, 2021.

## DAMAGES TO ASTRA

104.    As a direct and proximate result of the Individual Defendants' conduct, Astra will lose and expend many millions of dollars.

105.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and Defendants Kemp, Brannon, and Ednie and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection to the conduct discussed herein.

106.    In addition, such losses include the value for which Holicity was made to overpay for acquiring Legacy AS, which was acquired on terms unreasonable to Holicity given the undisclosed truth.

107.    Additionally, these expenditures include, but are not limited to, unjust compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

108.    As a direct and proximate result of the Individual Defendants' conduct, Astra has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and other misconduct.

## DERIVATIVE ALLEGATIONS

109.    Plaintiff brings this action derivatively and for the benefit of Astra to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of the Company, unjust

enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof.

110.    Astra is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

111.    Plaintiff is, and has been at all relevant times, a shareholder of the Company. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

112.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

113.    A pre-suit demand on the Board of Astra is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following seven individuals: Defendants Kemp, London, Flournoy, Lehman, McCaw, Nelson, and Stanford (collectively, the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of seven Director-Defendants that were on the Board at the time of the filing of this complaint.

114.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make false and misleading statements and omissions of material fact. These actions render the Director-Defendants unable to impartially investigate the charges and decide whether to pursue an action against themselves and the other perpetrators of this scheme.

115.     Moreover, as discussed below, the Director-Defendants are controlled by and beholden to Defendants Kemp and London, who are majority shareholders of the Company and control the Director-Defendants' continued positions at Astra. For this reason, too, the Director-Defendants would not be able to make a demand against Defendants Kemp and London with the requisite level of impartiality.

116.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

117.     Additional reasons that demand on Defendant Kemp is futile follow. Defendant Kemp has served as the CEO of Astra and as Chairman of the Board, since June 2021. He previously served in the same capacities as Legacy AS, which he co-founded. The Company provides Defendant Kemp with his principal occupation for which he receives substantial compensation as detailed above. For that reason, too, he would be unable to make a demand against Lehman and Stanford, who are responsible for apportioning his compensation. Thus, as the Company admits, he is a non-independent director. As CEO, Defendant Kemp is ultimately responsible for the false and misleading statements and omissions that were made leading up to and after the Merger. This includes those statements which he personally made during earnings calls. Moreover, he signed SOX certifications attesting to the accuracy of the 10-Q/A and the 3Q 10-Q. The 2021 Proxy Statement was also solicited on his behalf and the false and misleading elements contained therein contributed to his reelection to the Board. As the Company's highest

officer and as a trusted Company director, Defendant Kemp conducted little, if any, oversight of the schemes to engage in the Overpayment Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Kemp is a defendant in the Securities Class Actions. For these reasons, Defendant Kemp breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.    Additional reasons that demand on Defendant London is futile follow. Defendant London, like Defendant Kemp, co-founded Legacy AS and serves in an executive capacity (as CTO) at Astra and as a Company director since June 2021.  Thus, his primary source of livelihood is tied to the compensation he receives from the Company. For that reason, too, he would be unable to make a demand against Lehman and Stanford, who are responsible for apportioning his compensation. As the Company recognizes, this renders him not independent.  As a trusted Company director, Defendant London conducted little, if any, oversight of the schemes to cause the Company to engage in the Overpayment Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant London is responsible for many of the false and misleading statements made herein, including those in the 10-Q/A and 3Q 10-Q which he signed and signed SOX certifications for. He further solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to his reelection to the Board. For these reasons, Defendant London breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    Additional reasons that demand on Defendant Flournoy is futile follow. Defendant Flournoy has served as an Astra director since August 2021. She also serves as Chair of the Nominating and Corporate Governance Committee. As a trusted Company director, Defendant Flournoy conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Flournoy solicited the 2021 Proxy Statement. The false and misleading elements of the 2021 Proxy Statement contributed to the reelection of Defendants Kemp and London as directors. For these reasons, Defendant Flournoy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

120.    Additional reasons that demand on Defendant Lehman is futile follow. Defendant Lehman has served as a Company director since June 2021. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. As a trusted Company director, Defendant Lehman conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Lehman solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to the reelection of Defendants Kemp and London to the Board. For these reasons, Defendant Lehman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121.    Additional reasons that demand on Defendant McCaw is futile follow. Defendant

McCaw has served as a Company director since the Merger in June 2021. He also served as Holicity's Chairman and CEO since June 2020. He currently serves as a member of the Nominating and Corporate Governance Committee. As a trusted Company director and former CEO of Holicity, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Overpayment Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McCaw solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to the reelection of Defendants Kemp and London to the Board. For these reasons, Defendant McCaw breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122.    Additional reasons that demand on Defendant Nelson is futile follow. Defendant Nelson has served as a Company director since August 2021.IShe also serves as a member of the Compensation Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Nelson solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to the reelection of Defendants Kemp and London to the Board. For these reasons, Defendant Nelson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

123.    Additional reasons that demand on Defendant Stanford is futile follow. Defendant Stanford has served as a Company director since the Merger in June 2021. He previously served

on the Board of Legacy AS since 2017. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Overpayment Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Stanford solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to the reelection of Defendants Kemp and London to the Board. For these reasons, Defendant Stanford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124.    Additional reasons that demand on the Board is futile follow.

125.    Demand in this case is further excused because Defendants Flournoy, Lehman, McCaw, Nelson and Stanford are beholden to and controlled by Defendants Kemp and London, primary interested wrongdoers who were controlling shareholders during the Relevant Period. Defendants Kemp and London control their continued nomination to the Board. In light of this of this control, Defendants Flournoy, Lehman, McCaw, Nelson and Stanford cannot impartially consider a demand against Defendants Kemp and London, as they are dependent on him for their continued positions with the Company and the compensation that goes with that. Thus, Defendants Flournoy, Lehman, McCaw, Nelson and Stanford are unable to evaluate a demand with disinterest or independence given Defendant Kemp's and London's control over them.

126.    Defendants Lehman, Nelson, and Stanford (the "Audit Committee Directors") served as members of the Audit Committee during the Relevant Period. Among other things, the Audit Committee Charter requires the committee members to oversee the audit process and Astra's

legal compliance program, including "discuss[ing] with management and the independent auditor the Company's system of internal controls, its financial and critical accounting practices and its policies relating to risk assessment and management[]" and reviewing disclosures made by the Company, CEO, and CFO during their certification process for Astra's annual and quarterly reports on Forms 10-K and 10-Q. In violation of the Audit Committee Charter, the Audit Committee Directors failed to adequately review and discuss the Company's Forms 10-Q, and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Directors breached their fiduciary duties, are not disinterested, and demand is excused as to them.

127.     In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. In addition, the Director-Defendants failed to secure and/or disclose any waivers of the Code of Conduct granted by the Board, which

constitutes a further violation of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

128.    Astra has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Astra any part of the damages Astra suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

129.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

130.    The acts complained of herein constitute violations of fiduciary duties owed by Astra's controlling shareholder, officers, and directors. These acts are incapable of ratification.

131.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Astra. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-

Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

132.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Astra to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

133.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Defendants Kemp, London, Flournoy, Lehman, McCaw, Nelson, and Stanford for Violations of Section 14(a) of the Exchange Act**

134.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

135.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

136.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

137.    Under the direction and watch of Defendants Kemp, London, Flournoy, Lehman, McCaw, Nelson, and Stanford, the 2021 Proxy Statement failed to disclose that: (1) contrary to the 2021 Proxy Statement's descriptions of the Board's and it committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it; (2) certain Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) certain Individual Defendants, including those soliciting the 2021 Proxy Statement, were breaching their fiduciary duties to the Company and its shareholders and were thus improperly interested in receiving unjust compensation.

138.    The 2021 Proxy Statement was also materially misleading because it failed to disclose that: (1) the Company did not have the capacity to launch its vehicles "anywhere"; (2) Legacy AS and later Astra's purported addressable market was exaggerated; (3) the effectiveness and reliability of the Company's designs were overstated; (4) the Company's plans to diversify and undertake its broadband constellation plan were unrealistic and; (5) the Company failed to maintain adequate internal controls. As a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

139.     In the exercise of reasonable care, Defendants Kemp, London, Flournoy, Lehman, McCaw, Nelson, and Stanford should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, electing Defendants Kemp and London to the Board.

140.     The false and misleading elements of the 2021 Proxy Statement led to, among other things, shareholders electing Defendants Kemp and London, allowing them to continue breaching their fiduciary duties to the Company.

141.     The Company was damaged as a result of the material misrepresentations and omissions in the 2021 Proxy Statement.

142.     Plaintiff, on behalf of Astra, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

143.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

145.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

146.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

147.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company did not have the capacity to launch its vehicles "anywhere"; (2) Legacy AS and later Astra's purported addressable market was exaggerated; (3) the effectiveness and reliability of the Company's designs were overstated; (4) the Company's plans to diversify and undertake its broadband constellation plan were unrealistic and; (5) the Company failed to maintain adequate internal controls. As a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

148.    In further breach of their fiduciary duties, the Individual Defendants failed to correct these false and misleading statements and omissions of material fact, or ensure the Company had adequate internal controls to effect their disclosure, rendering them personally liable to the Company.

149.    Moreover, the Defendants Kemp, Brannon, Stanford, Ednie and McCaw breached their fiduciary duties to the Company, or aided and abetted in such breaches, by engaging in and/or facilitating the Overpayment Misconduct.

150.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the

Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

151.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

152.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Astra has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

153.    Plaintiff on behalf of Astra has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

154.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

155.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

156.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from the Company that was tied to the

performance or artificially inflated valuation of the Company, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

157.    Plaintiff, as a shareholder and a representative of Astra, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including from any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

158.    Plaintiff on behalf of Astra has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

159.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

161.    As a direct and proximate result of the Individual Defendants' abuse of control, Astra has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Astra has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

162.    Plaintiff on behalf of Astra has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

163.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

164.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

165.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Astra has sustained and will continue to sustain significant damages.

166.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

167.    Plaintiff, on behalf of Astra, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

168.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

169.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

170.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

171.    Plaintiff, on behalf of Astra, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Kemp, Brannon, and Ednie for Contribution Under Sections 10(b) and 21D of the Exchange Act

172. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

173. Astra, along with Defendants Kemp, Brannon, and Ednie are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Kemp's, Brannon's, and Ednie's willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or director of the Company.

174. Defendants Kemp, Brannon, and Ednie, because of their positions of control and authority as controlling shareholder, officers, and/or director of Astra, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Astra, including the wrongful acts complained of herein and in the Securities Class Actions.

175. Accordingly, Defendants Kemp, Brannon, and Ednie are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

176. As such, Astra is entitled to receive all appropriate contribution or indemnification from Defendants Kemp, Brannon, and Ednie.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Astra, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to the Company;

(c)     Determining and awarding to Astra the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Astra and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Astra and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Astra to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Astra restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: April 27, 2021                    Respectfully submitted,

                                         **THE BROWN LAW FIRM, P.C.**

                                         _/s/ Timothy Brown_
                                         Timothy Brown
                                         767 Third Avenue, Suite 2501
                                         New York, NY 10017
                                         Telephone: (516) 922-5427
                                         Facsimile: (516) 344-6204
                                         Email: tbrown@thebrownlawfirm.net

                                         _Counsel for Plaintiff_

## **VERIFICATION**

I,   Adonis Gonzalez   am   a   plaintiff   in   the within   action. I have  reviewed   the   allegations   made   in   this   shareholder   derivative complaint,  know   the   contents   thereof,   and   authorize   its   filing.   To   those allegations   of which   I have  personal   knowledge,   I believe  those   allegations   to be   true.   As to   those allegations  of which  I   do   not   have personal knowledge, I rely  upon  my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____, 2022.

4/26/2022

DocuSigned by:

*adonis Gonzalez*     _____

B396A759341B467...

Adonis Gonzalez