## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADONIS GONZALEZ, derivatively on behalf of ASTRA SPACE INC. F/K/A HOLICITY INC., <br><br> Plaintiff, <br><br> vs. <br><br> CHRIS C. KEMP, KELYN BRANNON, STEVEN EDNIE, ADAM LONDON, MICHÈLE FLOURNOY, MICHAEL LEHMAN, CRAIG O. MCCAW, LISA NELSON, SCOTT STANFORD, RANDY RUSSELL, R. GERARD SALEMME, DENNIS WEIBLING, WAYNE PERRY, and CATHLEEN A. MASSEY, <br><br> Defendants, <br><br> and <br><br> ASTRA SPACE INC. F/K/A HOLICITY INC., <br><br> Nominal Defendant. | Case No.: 1:22-cv-02401-ENV-MMH <br><br><br><br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE AMENDED COMPLAINT

## INTRODUCTION

Plaintiff Adonis Gonzalez ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Astra Space Inc. f/k/a Holicity Inc. ("Astra" or the "Company"),[1] files this Verified Shareholder Derivative Amended Complaint against Individual Defendants Chris C. Kemp ("Kemp"), Kelyn Brannon ("Brannon"), Steven Ednie ("Ednie"), Adam London ("London"), Michèle Flournoy ("Flournoy"), Michael Lehman ("Lehman"), Craig O. McCaw ("McCaw"), Lisa Nelson ("Nelson"), Scott Stanford ("Stanford"), Randy Russell

---

[1] "Holicity" also refers herein to the "Company" prior to the July 2021 merger (the "Merger") and name change, whereas "Astra" refers to the "Company" after the Merger and name change.

("Russell"), R. Gerard Salemme ("Salemme"), Dennis Weibling ("Weibling"), Wayne Perry ("Perry"), and Cathleen A. Massey ("Massey") (collectively, the "Individual Defendants," and together with Astra the "Defendants") for breaches of their fiduciary duties as current/former controlling shareholders, directors and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against Defendants Kemp, London, Flournoy, Lehman, McCaw, Nelson, Stanford, Russell, Salemme, Weibling, Perry, and Massey for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and against Defendants Kemp, Brannon, Ednie, London, McCaw, Russell, Salemme, Weibling, Perry, and Massey for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's amended complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 2, 2021 through August 4, 2022, at least (the "Relevant Period").

2.      Astra is a launch vehicle company whose stated mission is to launch a new generation of launch and space services and products to improve life on Earth. The Company

focuses on developing and operating small launch vehicles ("small launchers") to provide small satellite delivery of payloads weighing up to 500 kilograms ("kg") to up to 500 kilometers into low Earth orbit ("LEO").

3.      Holicity was founded as a special purpose acquisition company ("SPAC") supported by major telecom billionaire, Defendant McCaw. Holicity's initial public offering ("IPO") closed on August 7, 2020, after which it began the process of looking for a company to merge with.

4.      Astra's functional predecessor ("Legacy AS") was founded in October 2016. Leading up to the Merger, Defendants touted Legacy AS's business prospects and plan to purportedly create a mass-produced portable launch system.

5.      While Legacy AS touted its historical speed to reach space and business opportunities that positioned Legacy AS to achieve its ultimate goal to expand its launch and space services, its actual business and prospects were significantly exaggerated.

6.      On February 2, 2021, Defendants announced that Holicity entered into a business combination agreement with Legacy AS and a wholly-owned merger subsidiary of the Company to effectuate a merger. The Merger was consummated on June 30, 2021. In connection with the Merger, Holicity agreed to acquire all of the outstanding equity interests of Legacy AS for approximately $2.03 billion in aggregate consideration, while Legacy AS shareholders would receive consideration in the form of shares of common stock of the post-Merger Astra.

7.      At the time of the Merger, Defendants Kemp, London, McCaw, Stanford, and Lehman were appointed as members of Astra's Board of Directors (the "Board"). Legacy AS thereafter became a wholly owned subsidiary of the Company and changed its name to "Astra Space Operations, Inc."

8.      While the Individual Defendants knew, or were highly reckless in not knowing, of significant issues with Legacy AS's purported strategy, credibility, and product designs and capacity, among other things, they nonetheless failed to disclose the existence or extent of the issues and instead caused and/or permitted the Company to issue false and misleading statements touting Legacy AS's addressable market, designs, launch capacity and business plans.

9.      Specifically, throughout the Relevant Period, Defendants publicly touted a launch cadence plan of conducting monthly launches in 2022, weekly launches in 2023, bi-weekly launches in 2024, and daily or near daily launches in 2025. Additionally, Defendants publicly touted their goal of increasing the maximum payload capacity of the Company's rockets to 500 kg by 2025. In doing so, however, Defendants failed to disclose that this goal depended on the Company cutting a "secret" $30 million dollar deal with Firefly Aerospace ("Firefly"), a competing small launch provider. Pursuant to the Firefly deal, the Company acquired the right to use Firefly's intellectual property ("IP") to manufacturer Firefly's "Reaver" engines for attachment to the Company's own rockets (rather than Astra's existing "Delphin" engines).

10.     These misrepresentations allowed the Merger to close on terms that were unreasonable and unfavorable to the Company and its shareholders, given the known yet undisclosed state of affairs at Legacy AS (the "Overpayment Misconduct").

11.     The truth emerged on December 29, 2021, when market researcher, Kerrisdale Capital released a report titled *Astra Space, Inc (ASTR): Headed for Dis-Astra* (the "Kerrisdale Report"), revealing a multitude of issues with Astra's touted business, prospects and true capabilities.

12.     The Kerrisdale Report revealed that the Company was not capable of launching from "anywhere in the world" given that the Company's domestic launches in the U.S. could only

4

take place at five commercial spaceports licensed by the Federal Aviation Administration ("FAA"). As for international launches, it was unlikely that other countries would grant approval for the Company to use their launch sites as countries generally prefer to support their own member nation launch programs.

13.     The Kerrisdale Report further disclosed that the Company, in furtherance of attaining its goal of increasing payload capacity to 500 kg by 2025, had entered into the agreement with Firefly. As the Firefly agreement restricts the Company from using more than two Reaver engines per rocket, the Company's payload capacity is effectively capped at 500 kg. This cap would make the Company uncompetitive given how other small launch providers are planning for payload capacities far greater than 500 kg. In fact, Firefly's Alpha rocket, which has a 1,170 kg payload capacity and is powered by four Reaver engines, recently had a successful orbital launch on October 1, 2022. Accordingly, the Firefly agreement was specifically designed to ensure that the Company would not be able to compete with Firefly and other small launch providers that can handle payload capacities greater than 500 kg.

14.     The Kerrisdale Report also cast heavy doubt on the Company's plan to achieve a daily or almost daily launch cadence of 300 launches per year by 2025, a claim that is completely unsupported by the total addressable market for small satellite launchers. Northern Sky Research ("NSR"), a global provider of satellite and space market research and consulting services, estimates that a total number of 2,255 LEO satellites will be launched in 2025. However, that 2,255 figure does not account for the operations of Space Exploration Technologies Corp. ("SpaceX"), which is forecast to launch 946 Starlink satellites (SpaceX launched 850 Starlink satellites in 2020). Assuming SpaceX only launches 90% of the 946 satellites, or 851 satellites, the 2,255 figure is reduced to 1,404. The 1,404 figure must be further reduced, however, to account for Chinese

and Russian satellites launching from Asia and Europe, which U.S. launch companies are prohibited from launching. Once "90% of satellites from Asia and 20% from Europe based on the contribution to these regions from Chinese and Russian satellites" are further subtracted from 1,404, the total number of LEO satellites projected to launch in 2025 is brought down to only 587. In light of SpaceX's recent "record for 134 satellites on a single mission," the "non-captive" total addressable market for small satellite launches "is easily supported by less than 100 total launches." Considering the Company also faces steep competition from dozens of launch competitors, some of which can handle payload capacities greater than 500 kg, the Company's goal of achieving a daily or near daily launch cadence by 2025 seems even more unreasonable and unsupported by the total addressable market.

15.     On this news, the Company's stock price fell $1.10 per share or approximately 14%, from closing at $7.71 per share on December 28, 2021, to close on December 29, 2021 at $6.61 per share.

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was unable to launch from "anywhere on the planet" since domestic launches could only take place at five commercial spaceports licensed by the FAA and international launches were unlikely to be approved because countries generally have a preference for their own member nation launch programs; (2) the Company's plan to achieve a daily or near daily launch cadence by 2025 was unsupported by the total addressable market for small satellite launches; (3) the plan to increase

payload capacity to 500 kg relied on an undisclosed agreement with Firefly under which the Company would manufacture Reaver engines using Firefly's IP; (4) the terms of the Firefly agreement effectively capped the Company's potential payload capacity at 500 kg to ensure that the Company would be unable to compete with Firefly and other small launch providers that could handle payload capacities greater than 500 kg; (5) the Company faced a foreseeable risk of not executing its plan to achieve daily launches by 2025 given the total addressable market; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

17.     In further breach of their fiduciary duties, the Individual Defendants failed to correct these false and misleading statements and omissions of material fact, or ensure the Company had adequate internal controls to affect their disclosure, rendering them personally liable to the Company.

18.     Likewise, Defendants Ednie, McCaw, Russell, Salemme, Weibling, Perry, and Massey breached their fiduciary duties to the Company by engaging in the Overpayment Misconduct and agreeing to and/or facilitating the Merger with Legacy AS on terms that were unreasonable to the Company given the known yet undisclosed truth concerning Legacy AS's state of affairs. Defendants Kemp, Brannon, London, and Stanford, who served as Legacy AS's leadership before the Merger, aided and abetted these breaches of fiduciary duty.

19.     In yet further breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

20.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and Chairman, and its former Chief Financial Officers ("CFO") to a consolidated federal securities fraud class action lawsuit pending in the

United States District Court for the Northern District of California (the "Securities Class Action"); the need to undertake internal investigations, the need to implement adequate internal controls; the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Company's board of directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1); Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9; and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

23.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

27.     Plaintiff is a current shareholder of Astra common stock. Plaintiff has owned Company common stock since the beginning of the Relevant Period and continues to hold Astra common stock through the present.

### Nominal Defendant Astra

28.     Astra is a Delaware corporation with its principal executive offices at 1900 Skyhawk Street, Alameda, California. Astra common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "ASTR."

### Defendant Kemp

29.     Defendant Kemp is one of Legacy AS's founders and served as its CEO prior to the Merger. He currently serves as Astra's CEO and Chairman of the Board. According to the Company's Schedule 14A filed with the SEC on September 7, 2021 (the "2021 Proxy Statement"), as of August 30, 2021, Defendant Kemp beneficially owned 6,650 shares of Class A common stock and 27,095,633 shares of Class B common stock, representing 35.48% of total voting power and rendering Defendant Kemp a controlling shareholder of Astra. Given that the price per share of the Company's common stock at the close of trading August 30, 2021 was $9.49, Defendant Kemp owned approximately $257 million worth of Astra stock.

30.     For the fiscal year ended December 31, 2021, Defendant Kemp received

$43,973,671 in total compensation, including $557,000 in base salary, $5,883,248 in stock awards,

$37,533,318 in option awards, and $104 in all other compensation.

31.     The 2021 Proxy Statement stated the following about Defendant Kemp:

**Chris Kemp** is our co-founder, Chairman and Chief Executive Officer. Mr. Kemp leads the overall company strategy and direction. Mr. Kemp founded Astra in October 2016. Mr. Kemp previously served as the Chief Technology Officer of NASA IT. During his time at NASA from November 2007 until March 2011, Mr. Kemp developed cloud computing strategy for the United States Federal Government with the White House and founded OpenStack, an open infrastructure software platform, which is the largest and fastest growing open source project in history, in 2010. Mr. Kemp currently serves on the Board of Directors at Scalr, an information technology and services company, and has served in that role since April 2015. Mr. Kemp has also served as an advisor to Planet Labs, an aviation and aerospace company, since January 2013, and Ripcord, a computer software company, since October 2015. Mr. Kemp previously founded and served as the CEO of three venture-backed start-ups, all of which are now owned by public companies. Mr. Kemp studied Computer Engineering at the University of Alabama in Huntsville and currently teaches at Stanford University.

**Defendant Brannon**

32.     Defendant Brannon served as CFO of Legacy AS prior to the Merger and continued

in such capacity at the Company following the Merger until her departure on November 9, 2022.

33.     For the fiscal year ended December 31, 2021, Defendant Brannon received

$23,099,317 in total compensation, including $420,417 in base salary, $300,000 in bonus,

$12,543,105 in stock awards, $9,829,891 in option awards, and $5,904 in all other compensation.

34.     The 2021 Proxy Statement stated the following about Defendant Brannon:

**Kelyn Brannon** serves as our Chief Financial Officer and has served in that role since December 2020. Ms. Brannon leads our finance, legal and people functions. Throughout her career, Ms. Brannon has served as the Chief Financial Officer for several companies in the information technology and software industries. Ms. Brannon previously served as the Chief Financial Officer at Asure Software from October 2017 until August 2020. She has also served as a self-employed Finance Executive Consultant from May 2015 to December 2020, through which she offered consultative services for board and audit committee presentations and corporate governance. Ms. Brannon was the Chief Financial Officer of Arista Networks, Inc. from July 2013 until April 2015. Prior to that, she was the Chief

10

Financial Officer at Delivery Agent, where she prepared Delivery Agent for its Initial Public Offering.

**Defendant Ednie**

35.     Defendant Ednie served as Holicity's CFO and secretary prior to the Merger, after which he discontinued his positions with the Company.

36.     The Company's proxy statement filed on Form 424B3 with the SEC on June 8, 2021 (the "Merger Proxy Statement") stated the following about Defendant Ednie:

> ***Steve Ednie*** has served as our Chief Financial Officer and Secretary since our formation. He also serves as Chief Financial Officer of Pendrell since September 2014. Mr. Ednie is an experienced financial executive with an extensive background in domestic and international accounting and tax matters, serving most recently as Chief Accounting Officer of Clearwire from October 2010 to April 2014, and as Vice President-Tax and Chief Tax Officer from 2004 to April 2014. Before joining Clearwire, Mr. Ednie served as the Director of Tax of Expedia, Inc., an Internet-based travel website company, from 2002 to 2004, as Executive Director–Tax and Chief Tax Officer of XO Communications Inc., a telecommunications company, from 1997 to 2002, and as Tax Manager of MIDCOM Communications, Inc., a telecommunications company, from 1996 to 1997. Mr. Ednie began his professional career at Coopers & Lybrand, LLP, an accounting firm, where he was a Senior Associate. Mr. Ednie has a Bachelor of Arts in Business Administration from the University of Washington.

**Defendant London**

37.     Defendant London is one of Legacy AS's founders and served as its Chief Technology Officer ("CTO") prior to the Merger. He currently serves as Astra's CTO and as a Company director. According to the 2021 Proxy Statement, as of August 30, 2021, Defendant London beneficially owned 29,143,555 shares of Class B common stock, representing 38.17% of total voting power and rendering Defendant London a controlling shareholder of Astra. Given that the price per share of the Company's common stock at the close of trading August 30, 2021 was $9.49, Defendant London owned approximately $276 million worth of Astra stock.

38.     For the fiscal year ended December 31, 2021, Defendant London received

$13,025,439 in total compensation, including $407,542 in base salary, $2,941,629 in stock awards, $9,676,164 in option awards, and $104 in all other compensation.

39.     The 2021 Proxy Statement stated the following about Defendant London:

**Adam London** is our co-founder, Chief Technology Officer and serves as one of our directors. Dr. London helped to found Astra in October 2016 and has served as the Chief Technology Officer and director since then. Dr. London leads our technology strategy and long-term product roadmap. Dr. London co-founded and served as a managing partner for Ventions, LLC, which was our predecessor company, from January 2005 until September 2016. While at Ventions, LLC, Dr. London spent 10+ years leading initiatives to miniaturize high-performance rocket technologies, supported by funding from the Defense Advanced Research Projects Agency, NASA, and other government agencies. Prior to founding Ventions, LLC and Astra, Dr. London served as an engagement manager at McKinsey & Company, where he focused on the automotive and manufacturing sectors. Dr. London holds a B.S., M.S. and Ph.D. in Aerospace Engineering from Massachusetts Institute of Technology, where his research culminated in the creation of a liquid-cooled chemical rocket engine smaller than a postage stamp.

**Defendant Flournoy**

40.     Defendant Flournoy has served as a Company director since August 2021. She also serves as Chair of the Nominating and Corporate Governance Committee.

41.     For the fiscal year ended December 31, 2021, Defendant Flournoy received $178,759 in total compensation, including $40,625 in fees earned or paid in cash and $138,134 in stock awards.

42.     The 2021 Proxy Statement stated the following about Defendant Flournoy:

**Michèle Flournoy**, age 60, has served as one of the Company's directors since August 2021. Ms. Flournoy's career has spanned many roles in the Defense industry, ranging from research to advisory. She is the co-founder and managing partner of WestExec Advisors, a strategic advisory firm formed in early 2018. She previously served as the Under Secretary of Defense for Policy from February 2009 to February 2012, acting as principal advisor to the Secretary of Defense in the formulation of national security and defense policy, oversight of military plans and operations, and in National Security Council deliberations. She led the development of the Department of Defense's 2012 Strategic Guidance and represented the Department in dozens of foreign engagements, in the media and before Congress. Ms. Flournoy co-founded the Center for a New American Security ("CNAS"), a

12

bipartisan think tank, in 2007 and serving as President until 2009. She returned to serve as the CEO of CNAS from July 2014 through December 2017. Ms. Flournoy is also the recipient of numerous honors and awards, and has edited and authored various works on a broad range of defense and national security issues. In addition, Ms. Flournoy has also served on numerous business and advisory boards such as Booz Allen Hamilton, Spirit of America, The U.S. Naval Academy Foundation, CARE and the Honorary Advisory Committee of The Leadership Council for Women in National Security. Ms. Flournoy is also a former member of the President's Intelligence Advisory Board, the CIA Director's External Advisory Board, and the Defense Policy Board, and is currently a member of the Council on Foreign Relations and the Aspen Strategy Group, and is a Senior Fellow at Harvard's Belfer Center for Science and International Affairs. We believe Ms. Flournoy is qualified to serve as a member of the Board based on her extensive experience in the defense industry and as a co-founder of two respected and successful organizations.

**Defendant Lehman**

43.     Defendant Lehman has served as a Company director since June 2021. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2021 Proxy Statement, as of August 30, 2021, Defendant Lehman beneficially owned 6,250 shares of Class A common stock. Given that the price per share of the Company's common stock at the close of trading August 30, 2021 was $9.49, Defendant Lehman owned approximately $59,312 worth of Astra stock.

44.     For the fiscal year ended December 31, 2021, Defendant Lehman received $225,755 in total compensation, including $38,750 in fees earned or paid in cash and $187,005 in stock awards.

45.     The 2021 Proxy Statement stated the following about Defendant Lehman:

*Michael Lehman*, age 71, has served as one of the Company's directors since June 2021. Mr. Lehman has also served the University of Wisconsin in various capacities since March 2016, currently as Interim Chief Operating Officer of the Wisconsin School of Business, and previously as Special Advisor to the Chancellor, Interim Vice Provost for Information Technology, Chief Information Officer and Interim Vice Chancellor for Finance and Administration. He is also currently on the Board of MGIC Investment Corp. and has served in that role since 2001. He had previously been a consultant (2014-2016); Interim Chief Financial

Officer at Ciber Inc., a global information technology company (2013-2014); Chief Financial Officer of Arista Networks, a cloud networking firm (2012-2013); and Chief Financial Officer of Palo Alto Networks, a network security firm (2010-2012). Earlier in his career, he was the Executive Vice President and Chief Financial Officer of Sun Microsystems, Inc., a provider of computer systems and professional support services. Mr. Lehman is qualified to serve as one of the Company's directors due to his financial and accounting knowledge gained through his service as chief financial officer of a large, multinational public company; his skills in addressing the range of financial issues facing a large company with complex operations; his senior executive and operational experience; as well as his technology and cybersecurity experience.

**Defendant McCaw**

46.     Defendant McCaw served as a Company director from June 2021 until June 2022. He also served as Holicity's Chairman and CEO from June 2020 until the Merger. He served as a member of the Company's Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, as of August 30, 2021, Defendant McCaw beneficially owned 7,900,484 shares of Class A common stock, representing 1.03% of total voting power. Given that the price per share of the Company's common stock at the close of trading August 30, 2021 was $9.49, Defendant McCaw owned approximately $74.9 million worth of Astra stock.

47.     For the fiscal year ended December 31, 2021, Defendant McCaw received $198,192 in total compensation, including $46,250 in fees earned or paid in cash and $151,942 in stock awards.

48.     The 2021 Proxy Statement stated the following about Defendant McCaw:

*Craig O. McCaw*, age 72, is an industry pioneer, visionary investor, serial entrepreneur and deeply experienced operator. Mr. McCaw has been Chairman and Chief Executive Officer of Holicity since June 2020. He is also Chairman and Chief Executive Officer of Colicity (NASDAQ: COLIU) since February 2021. Mr. McCaw has been Chairman of Pendrell since 2000, where he acted as Executive Chairman from 2014 to 2018 and currently acts as Co-Chief Executive Officer since October 2018. Mr. McCaw has also served as Chairman and Chief Executive Officer of Eagle River Inc. since June 1993, President of COM Investments LLC since December 1997, and President of COM Family Foundation since 1998.

14

Since October 2010, Mr. McCaw has served on the board of directors, including as former Chairman, of The Nature Conservancy. Mr. McCaw currently serves as a Member of the Climate Leadership Council, a Board Member of the Horatio Alger Association and a Global Advisory Board Member of the Khan Academy. From 2018 to 2021, Mr. McCaw served as a Member of the Advisory Board for Project LOON, a former subsidiary of Alphabet (NASDAQ: GOOGL). From 2014 to 2018, Mr. McCaw was a Member of the Harvard Business School Board of Deans Advisors.

Throughout his career of over five decades, Mr. McCaw started and built many companies in the cable, cellular telephone and wireless broadband industries. Mr. McCaw was Chairman and Chief Executive Officer of McCaw Cellular Communications, which he built into the nation's leading provider of cellular services before its sale to AT&T in 1996. Following the sale of McCaw Cellular, Mr. McCaw restructured Nextel Communications and later founded Nextel International and co-founded Nextel Partners. He also founded NEXTLINK Communications in 1994, later renamed XO Communications, where he served as Chief Executive Officer and as a Director. In 2003, Mr. McCaw co-founded and served as Chairman and Chief Executive Officer of Clearwire Corporation, a wireless broadband company. Mr. McCaw is a graduate of Stanford University.

We believe Mr. McCaw is qualified to serve as one of our directors due to his extensive business experience and expertise, and his ability to identify key business opportunities for significant growth.

**Defendant Nelson**

49.     Defendant Nelson has served as a Company director since August 2021. She also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee.

50.     For the fiscal year ended December 31, 2021, Defendant Nelson received $195,008 in total compensation, including $25,000 in fees earned or paid in cash and $170,008 in stock awards.

51.     The 2021 Proxy Statement stated the following about Defendant Nelson:

***Lisa Nelson***, age 45, has served as one of the Company's directors since August 2021. Ms. Nelson has extensive knowledge and depth of experiences both as a strategic and operational leader and has developed valuable perspective in matters of digital transformation, business growth strategy and risk management. Ms. Nelson has served in different management positions at several Global 500 companies around the world. Ms. Nelson was most recently at Microsoft from

15

August 2005 to October 2019 where she held executive roles across corporate accounting, investor relations, finance and business development. While at Microsoft, Ms. Nelson co-founded Microsoft's first venture fund, M12, and served as Managing Director for three years before retiring from Microsoft. Following her retirement from Microsoft, she has served as an advisor and director to a number of global businesses and charitable organizations. Currently, she is a member of the board of directors of the following organizations: Transforming Age (since July 2020), DNA Seattle (since June 2021) and Kuelap Inc. (since June 2021). She also serves on the advisory boards of Flying Fish Partners (since July 2020), Movac, a venture capital fund in New Zealand (since July 2020), Brooks Running (since January 2021), amongst others. She is also Edmund Hillary Fellow.

**Defendant Stanford**

52.     Defendant Stanford has served as a Company director since June 2021, and previously served on the Board of Legacy AS since 2017. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee. According to the 2021 Proxy Statement, as of August 30, 2021, Defendant Stanford beneficially owned 29,656,192 shares of Class A common stock, representing 3.88% of total voting power. Such shares are considered managed by ACME, LLC and affiliates, which include Sherpa Ventures Fund II, LP and ACME SPV AS, LLC (together, "ACME Capital"). Defendant Stanford and "Hany Nada exercise voting and dispositive control over the securities held by ACME Capital and thus may be deemed to beneficially own such securities." Given that the price per share of the Company's common stock at the close of trading August 30, 2021 was $9.49, Defendant Stanford owned approximately $281.4 million worth of Astra stock.

53.     For the fiscal year ended December 31, 2021, Defendant Stanford received $256,256 in total compensation, including $22,500 in fees earned or paid in cash and $233,756 in stock awards.

54.     The 2021 Proxy Statement stated the following about Defendant Stanford:

*Scott Stanford*, age 51, has served as a member of the Board since December 2017. Mr. Stanford has served as the co-founder of several companies, including ACME,

16

LLC and its affiliates, a venture capital firm, since February 2013; and Silicon Foundry, a membership-based corporate advisory platform, since February 2013. Prior to these roles, Mr. Stanford served as a managing director at Goldman Sachs from June 2004 until February 2013. Mr. Stanford also serves as a member of the board of directors of several private companies, including Cue Health Inc., a health technology company, since December 2017; Curology, Inc., a direct to consumer prescription skincare company, since September 2015; Luka, Inc., an artificial intelligence and software development company, since April 2016; and BFA Industries (formerly known as ipsy) a personalized beauty commerce company, since September 2015. Mr. Stanford holds an MBA from Harvard Business School. We believe Mr. Stanford is qualified to serve as a member of the Board based on his experience as a director of multiple technology and healthcare companies. We believe Mr. Stanford is qualified to serve as a member of the Board based on his experience as a director of multiple technology and healthcare companies.

**Defendant Russell**

55.     Defendant Russell served as Holicity's Chief Investment Officer prior to the Merger, after which he discontinued his position with the Company.

56.     The Merger Proxy Statement stated the following about Defendant Russell:

***Randy Russell*** has served as our Chief Investment Officer since our formation. He joined Pendrell in November 2019 as the CEO and co-Founder of Pendrell Financial Services, a newly formed Pendrell subsidiary, where he helps to drive corporate strategy, deal sourcing and transaction execution for Pendrell. He also serves as a member of Pendrell's Board of Directors. In addition, he is a member of the Boards of Directors for Hello Alice and RVH Solutions, two of Pendrell's investment portfolio companies.

Prior to Pendrell, Mr. Russell had almost 20 years of experience in the Financial Services industry and served as the Americas Head of Media & Telecom investment banking at Deutsche Bank Securities (NYSE: DB) and was a Senior Managing Director on the Global Technology, Media & Telecom investment banking team at Bank of America (NYSE: BAC). In addition to managing key client relationships across the TMT sector, Mr. Russell has significant transaction experience with leading private equity firms. Mr. Russell has completed more than $230 billion in public and private market transactions across corporate acquisitions and divestitures, leveraged buyouts, IPOs, tracking stock creation, new issue debt securities and refinancing activity for investment grade to highly leveraged issuers. Mr. Russell has been a trusted advisor to high-profile c-suite executives, management teams and board of director's members across a variety of communications, media and technology companies and was a key advisor to various McCaw entities during his career as an investment banker before being recruited to join Pendrell.

Before starting his career in finance, Randy was an Officer and Naval Aviator in the United States Marine Corps and rose to the rank of Major in the USMC Reserves. He participated in various global deployments including service with several forward deployed Marine Expeditionary Units and received the Navy and Marine Corp Achievement Medal for leadership, as well as other commendations. Mr. Russell holds an MBA in Finance from the Johns Carey Business School, where he served on the Dean's Alumni Advisory Board for 6 years. He graduated from the Aviation Safety Officers Program at the Naval Postgraduate School in Monterrey, California and received a Bachelor of Arts in English from the University of Delaware.

**Defendant Salemme**

57.     Defendant Salemme served as a director of Holicity prior to the Merger, after which

he discontinued his position with the Company.

58.     The Merger Proxy Statement stated the following about Defendant Salemme:

***R. Gerard Salemme*** serves as a Director of Holicity. Mr. Salemme has served as Co-Chief Executive Officer and Director of Pendrell since October 2018 and has served in various capacities for Pendrell since 2011. He also serves on the Board of Directors of Altaeros, Inc., Onclave Networks, Inc and ContentGuard, Inc., and is Vice Chairman of the Board of Trustee at The Langley School. He was CEO of the Wireless Network Development Group, LLC., and served on the Board of Directors of EarthLink, Inc., Clearwire Corp, Chairman of RECON Dynamics LLC, ICO North America, Inc., and Taqua, LLC and is a Partner in Eagle River Partners, LLC, a private investment firm.

Mr. Salemme has over 30 years of experience in business and government, as a founder and Executive Vice President-Strategy, Policy and External Affairs of Clearwire from 2004 to 2010, and prior to that as Senior Vice President, External Affairs of XO. Prior to joining XO, Mr. Salemme held senior executive positions with AT&T Corporation and McCaw Cellular Communications Inc. He also held the position of Senior Telecommunications Policy Analyst for the U.S. House of Representatives Subcommittee on Telecommunications and Finance from 1987 to 1991 and served as Chief of Staff to Congressman Ed Markey of Massachusetts from 1976 to 1984. Mr. Salemme earned a B.A. in Political Science and Economics and an M.A. in Economics from Boston College. Mr. Salemme was selected to serve on our board of directors due to his expertise and experience in acquiring and operating TMT businesses.

**Defendant Weibling**

59.     Defendant Weibling served as a director of Holicity prior to the Merger, after which

he discontinued his position with the Company.

60.    The Merger Proxy Statement stated the following about Defendant Weibling:

***Dennis Weibling*** serves as a Director of Holicity. Mr. Weibling is currently the Managing Director of Rally Capital LLC, a private equity firm based in Kirkland, Washington. Rally Capital was formed in late 2004 to invest primarily in telecommunications companies. From 2006 until its sale in October 2019, Mr. Weibling served on the board of directors of Sotheby's for which he served as chairman of the audit and finance committees. He served as interim Chief Financial Officer at Sotheby's until March 2016. He currently serves as a Trustee for Seattle Pacific University. As a result of Rally Capital's and other investments, Mr. Weibling serves on the boards of the following private companies: Rise Communities LLC, Tempered Networks, Bestworth Rommel, LLC, Red Bison Corporation, Sarcos Robotics, Inc. and Far West Fabricators, LLC, and previously served as a director of Teledesic Corporation.

Mr. Weibling was a partner at Clark Nuber & Co., a certified public accounting firm located in Bellevue, Washington from 1986 to 1993. He also served as President of Eagle River, Inc., from October 1993 through December 2001, and as Vice Chairman of Eagle River Investments from January 2002 through November 2004. He served as Chief Executive Officer of Nextel Communications Inc. from October 1995 to March 1996 and as a Director of Nextel from July 1995 until April 2004. At Nextel, he was a Member and Chairman of the operations, audit, finance, and compensation committees at various times during that period. Mr. Weibling served as a board member of Nextel Partners from 1998 to 2006, for which he chaired the audit committee. His other public board was XO Communications, Inc. where he served from 1996-2003. He served on both the compensation and audit committees for the company. Mr. Weibling was selected to serve on our board of directors due to his expertise and experience in acquiring and operating TMT businesses.

**Defendant Perry**

61.    Defendant Perry served as a director of Holicity prior to the Merger, after which he

discontinued his position with the Company.

62.    The Merger Proxy Statement stated the following about Defendant Perry:

***Wayne Perry*** serves as a Director of Holicity. Mr. Perry is the Chief Executive Officer of Shotgun Creek Investments LLC — a private investment firm that builds and owns office buildings and apartments in the Pacific Northwest. Mr. Perry is an honors graduate of the Foster School of Business at the University of Washington and of the Lewis and Clark Law School. Mr. Perry also has an LL.M. in taxation from New York University.

Mr. Perry started his career working for a Seattle law firm and then became General Counsel and later President of McCaw Cellular Communications, Inc. Mr. Perry went on to be Chief Executive Officer of NextLink Communications, Inc. and then Edge Wireless, LLC. Mr. Perry was elected to the Wireless Industry's Hall of Fame in 2011. In addition to being a little league baseball coach, Wayne has been a longtime Boy Scout Volunteer (Cubmaster, Scoutmaster, etc.) and served as 34th President of the Boy Scouts of America. Wayne and his wife Christine are currently volunteers of the BSA at the local, national and world levels. Mr. Perry was selected to serve on our board of directors due to his expertise and experience in acquiring and operating TMT businesses.

**Defendant Massey**

63.     Defendant Massey served as a director of Holicity, after which she discontinued her position with the Company.

64.     The Merger Proxy Statement stated the following about Defendant Massey:

***Cathleen A Massey*** serves as a Director of Holicity. Ms. Massey has served as a Government Affairs lead for four large telecommunications companies, most recently as Vice President, Federal Regulatory, T-Mobile US, Inc. from February 2016 to the present and Senior Policy Counsel from May 2014 to February 2016. Prior to joining T-Mobile, Ms. Massey was Vice President, Regulatory Affairs and Public Policy for Clearwire Corporation, from December 2008 to September 2013, leading up to its acquisition by Sprint/Softbank.

Ms. Massey has also served as a Deputy Chief of the FCC's Wireless Telecommunications Bureau and as a Vice President for AT&T Wireless and XO Communications. She has worked in the wireless industry for more than 25 years, beginning as a regulatory attorney for cellular telephone industry pioneer McCaw Cellular Communications. Ms. Massey received her J.D. from the University of Virginia School of Law and her B.S. in Journalism from Northwestern University. Ms. Massey was selected to serve on our board of directors due to her expertise and experience in acquiring and operating TMT businesses**.**

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

65.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost

ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

66.     Each controlling shareholder, director, and officer of the Company owed the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors, and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

68.     To discharge their duties, the controlling shareholder, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

69.     Each Individual Defendant, by virtue of their position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the controlling shareholder, officers, and directors of the Company has been ratified

by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

70.     As controlling shareholders, senior executive officers, and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

71.     To discharge their duties, the controlling shareholders, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers, and directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Astra's own Code of Business Conduct and Ethics ("Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and,

22

upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72.      Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

73.     At all times relevant hereto, the Individual Defendants were the agents of each other and/or of the Company and were at all times acting within the course and scope of such agency.

74.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

75.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

78.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is or was a director of the Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

79.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

## ASTRA'S CODE OF CONDUCT

### *Code of Conduct*

80.     Astra's Code of Conduct opens by stating that it "provides a general statement of the expectations of Astra Space, Inc. (the "Company") regarding the ethical standards that each director, officer and employee should adhere to while acting on the Company's behalf."

81.     The Code of Conduct further provides that it was adopted by the Board to "deter wrongdoing" and promote the following:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC"), and in other public communications made by the Company;

- compliance with applicable governmental laws, rules and regulations;

- the prompt internal reporting of violations of this Code to an appropriate person or persons identified herein; and

- accountability for adherence to this Code.

82.    Regarding "Reporting Violations" the Code of Conduct states:

If you know or reasonably believe that there has been a violation of this Code or any illegal behavior has occurred, you must report the violation to your supervisor or to the General Counsel or his or her designee.

Any supervisor who obtains information about a Code violation has the responsibility to report the matter immediately to the General Counsel or his or her designee. No employee who in good faith reports a Code violation will be retaliated against or will otherwise be discriminated against in the terms and conditions of his or her employment.

83.    Regarding "Conflicts of Interest," the Code of Conduct states:

Directors, officers and employees should avoid activities that create or give the appearance of a conflict of interest between their personal interests and the Company's interests. A conflict of interest exists when a personal interest or activity of a director, officer or employee could influence or interfere with that person's performance of duties, responsibilities or commitments to the Company.

84.    The Code of Conduct makes clear the importance of maintaining accurate Company

records stating, among other things:

The Company's business affairs are also subject to certain internal and external disclosure obligations and recordkeeping procedures. As a public company, we are committed to abiding by our disclosure obligations in a full, fair, accurate, timely and understandable manner. Only with reliable records and clear disclosure procedures can we make informed and responsible business decisions. When disclosing information to the public, it is our policy to provide reliable and accurate information. To maintain reliability and accuracy, specific Company spokespersons are designated to respond to questions from the public. Only these individuals are authorized to release information to the public at appropriate times. All inquiries from the media or investors should be forwarded immediately to the Chief

Executive Officer, the Chief Financial Officer or their respective designees. The Chief Financial Officer and the General Counsel must approve all press releases, speeches, publications or other official Company disclosures in advance. Our internal control procedures are further regulated by the Sarbanes-Oxley Act of 2002. The Sarbanes-Oxley Act of 2002 was a U.S. legislative response to events at public companies involving pervasive breakdowns in corporate ethics and internal controls over financial reporting. It was designed to rebuild confidence in the capital markets by ensuring that public companies are operated in a transparent and honest manner. Ensuring proper and effective internal controls is among the Company's highest priorities.

85.     The Code of Conduct also contains provisions related to the "Proper Use of Corporate Assets[.]" The Code of Conduct states: "The Company's assets shall be used for their intended business purposes. Personal use of the Company's funds or property, including charging personal expenses as business expenses, inappropriate reporting or overstatement of business or travel expenses and inappropriate usage of Company equipment or the personal use of supplies or facilities without advance approval from an appropriate officer of the Company shall be considered a breach of this Code."

86.     At a high level, the Code of Conduct states: "[w]e recognize the fact that, as participants in the fuel cell industry, we work in a heavily regulated industry. Adherence to regulatory compliance principles and procedures is among our highest priorities. We are committed to sharing helpful and accurate information about our products.

87.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, to facilitate and disguise the Individual Defendants' violations of law, including breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and aiding and abetting thereof.  In further violation of the Code of Conduct and relevant corporate the Individual Defendants who worked at Astra failed to avoid conflicts of interest or the

appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Moreover, the Individual Defendants who worked at Astra failed to secure and/or disclose any waivers of the Code of Conduct granted by the Board, which constitutes a further violation of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

88.     Although small satellites are traditionally launched together with larger satellites, a distinct class of small launch companies has focused on providing delivery service of small satellites, as a primary payload, into LEO. The market for small satellite launches has become very competitive, with over 100 small launch providers in some stage of development today.

89.     Astra is an aerospace company whose stated mission is to launch a new generation of launch and space services and products to improve life on Earth. The Company purports to develop the world's first mass-produced dedicated orbital launch system, which consists of a small launcher and mobile ground infrastructure that can fit inside standard shipping containers for rapid deployment anywhere in the world that the Company's spaceports are located. To provide customers with daily space delivery, the Company's purported strategy involves increasing launch capability and increasing the maximum payload capacity of the Company's rockets.

90.     Holicity was founded as a SPAC backed by major telecom billionaire, Defendant McCaw. The sole purpose of Holicity's existence was to effectuate a merger, capital stock exchange, acquisition, stock purchase, or engage in a comparable business arrangement with one or more businesses. Before the Merger, Holicity was a "shell" company that had no business

operations, and its assets comprised mainly of cash only. Holicity's IPO closed in August 2020, after which it began the process of looking for a company to merge with and adopt the operations of. The operating company benefits from the business combination by getting access to investment without undergoing the strictures of a formal IPO, and the SPAC and its shareholders benefit by having (ideally) more valuable shares from combining with a valuable target company.

91.    Astra's functional predecessor, Legacy AS, was founded in October 2016. Leading up to the Merger, Defendants touted Legacy AS's business prospects and plan to purportedly create a mass-produced portable launch system.

92.    While Legacy AS touted its historical speed to reach space and business opportunities that positioned Legacy AS to achieve its ultimate goal to expand its launch and space services, its actual business and prospects were significantly exaggerated.

93.    Throughout the Relevant Period, Defendants publicly touted plans for achieving a daily or near daily launch cadence by 2025 and increasing payload capacity to 500 kg by 2025.

94.    However, although publicly touting otherwise, the Company was not capable of launching from "anywhere in the world," and the Company's plan to achieve a daily or almost daily launch cadence by 2025 was blatantly unsupported by the total addressable market for small satellite launchers. In truth, the Company's plan to increase payload capacity depended on a restrictive deal with one of its competitors, Firefly, to use Firefly's IP to manufacture Reaver engines for the Company's rockets. In exchange, Astra's potential payload capacity would be severely limited.

95.    As confirmed by multiple former employees of Astra interviewed in connection with the Securities Class Action, the Company's deal with Firefly was kept a secret from the public. According to the Securities Class Action's first confidential witness ("CW"), who worked

29

on the Company's rocket engine production between June 2021 and June 2022, CW1, the Company entered the Firefly deal to avoid upgrading its internal rocket design. According to an early employee of Astra who worked as a staff engineer between 2016 and 2021, CW2, the Firefly deal because it was "the best way to get a large engine fast." CW2 also stated that the Company kept the Firefly deal a secret because "it's never cool to be a company that builds engines and then buys somebody else's engine . . . . It's kind of embarrassing." According to CW4, a former propulsion engineer who worked at Astra from 2020 to 2021, the Company entered into the Firefly deal to increase the payload capacity of the Company's rockets from 300 kg to 500 kg. CW4 also stated that the Company kept the Firefly deal "strictly confidential" to avoid creating uncertainty and undermining investor confidence in the Company.

96.    Moreover, according to CW4, "the propulsion team knew there was no way to conduct 300 launches by 2025 while concurrently developing new vehicles." Although this concern was communicated to Company leadership, it went unheeded. According to CW4, everyone at the Company "recognized the daily launch services part of Astra's model was ridiculous."

97.    The Company faces competition from other small launch providers that can handle payload capacities significantly greater than 500 kg. According to CW3, a former test engineer who worked at the Company in 2021, rockets with payload capacities in the range of 300 to 500 kg are "not financially viable."

**The Merger and the Overpayment Misconduct**

98.    On February 2, 2021, Defendants announced that Holicity entered into a business combination agreement with Legacy AS and Holicity Merger Sub Inc., a wholly-owned merger subsidiary of the Company to effectuate a merger whereby Astra would continue as the surviving

company and Legacy AS would continue as a wholly-owned subsidiary of Holicity. Defendants Kemp, London, McCaw, Stanford and Lehman were appointed to serve as directors on the Board following the close of the Merger.

99.     As noted above, the Merger closed on June 30, 2021. Legacy AS, which became a wholly owned subsidiary of the Company, changed its name to "Astra Space Operations, Inc." and Holicity adopted Legacy AS's prior name, "Astra Space, Inc."

100.    Per the terms of the Merger, *inter alia*, Holicity agreed to acquire all the outstanding equity interests of Legacy AS for approximately $2.03 billion in aggregate consideration. Legacy AS shareholders also received consideration in the form of shares of common stock of the new Company.

101.    These terms were unfavorable and unreasonable to Holicity shareholders, given that Legacy AS was a less valuable acquisition than Holicity shareholders were led to believe.

### False and Misleading Statements

***February 2, 2021 Press Release and Investor Presentation***

102.    On February 2, 2021, the Company issued a press release attached to a current report on Form 8-K signed by Defendant Ednie and filed with the SEC the same day. The press release, titled "Astra to become the first publicly traded space launch company on NASDAQ via merger with Holicity [,]" announced the intended business combination and maintained that, "'This transaction takes us a step closer to our mission of improving life on Earth from space by fully funding our plan to ***provide daily access*** to low Earth orbit from anywhere on the planet,' said Chris Kemp, Founder, Chairman and CEO of Astra." (Emphasis added.)

103.    The statements referenced in ¶ 102 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading.

Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's plan to "provide daily access to low Earth orbit" was unsupported by the total addressable market for small satellite launches; (2) the Company was unable to launch from "anywhere on the planet" since domestic launches can only take place at five commercial spaceports licensed by the FAA and international launches are unlikely to be approved because countries generally have a preference for their own member nation launch programs; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

104.    Also attached to the February 2, 2021 current report was an investor presentation featuring slides which touted Legacy As's launch cadence plan and the Company's purported addressable market in the future. Specifically, the following slide of the investor presentation set forth the Company's launch cadence plan of attaining daily launches by 2025:



105.    The statements referenced in ¶ 104 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading.

Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's plan to carry out daily launches by 2025 was unsupported by the total addressable market and (2) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *February 25, 2021 Bloomberg TV Report*

106.    On February 25, 2021, Bloomberg TV released a report which included excerpts from an interview with Defendant Kemp about the Merger. A transcript of the report was subsequently attached to a current report filed on Form 8-K with the SEC the very next day. The report contained the following statements made by Defendant Kemp:

> Over the next few years here at this facility, we'll be increasing the production rate of rockets from monthly this year to weekly in 2023, to bi-weekly in 2024, to a full daily production rate in 2025. And by ***launching a rocket a day***, we'll be able to bring the price point down to about a half a million dollars.

(Emphasis added).

107.    The statements referenced in ¶ 106 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's plan of "launching a rocket a day" was unsupported by the total addressable market and (2) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *March 1, 2021 SpaceNews Article*

108.    On March 1, 2021, SpaceNews published an article titled "Astra's 100-year plan: Q&A with CEO Chris Kemp" which discussed Astra's plans for ramping up launch activity. In the article, Defendant Kemp touted the following: "In 2025, we hope to be hitting our daily launch cadence with a vehicle that can throw about 300 kilograms to a reference orbit. Ultimately, that

means we can meet the needs of all these megaconstellations like Kuiper. The target for the company is being a megaconstellation provider."

109.    In response to the SpaceNews interviewer's question about how the Company planned on scaling up operations to support "doing 300 launches a year in 2025, which would be nearly three times the number of launches worldwide last year," Defendant Kemp stated:

> We need to have a high level of automation, so at the foundation of our platform is software. We had at our first launch of 1.0 about 30 people in Kodiak. In our 2.0 launch, we had about 15 people. In our 3.0 launches, we got it down to five. We now can take the entire spaceport, as we demonstrated with the DARPA Launch Challenge, pack it up into four shipping containers, unpack it, and launch the rocket with five people. We're never going to go to a government spaceport.

110.    The statements referenced in ¶¶ 108-109 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's plan to reach a daily or near daily launch cadence was unsupported by the total addressable market and (2) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *April 14, 2021 Analyst Day*

111.    On April 14, 2021, the Company hosted a virtual Analyst Day, during which Defendant Kemp stated the following regarding the Company's plans for ramping up launch activity and building additional capabilities:

> So as we begin commercial launch operations this summer, we'll start to scale to monthly launch, and we plan to begin monthly launch operations *leading to weekly, bi-weekly, and then daily launch operations in 2025*. While we're launching, we're going to be adding capabilities. We're going to be building the rocket factory out. We're going to be building the capability to begin constructing and launching satellites and spacecraft.

(Emphasis added).

112.    The statements referenced in ¶ 111 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's plan to reach "daily launch operations in 2025" was unsupported by the total addressable market and (2) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *May 19, 2021 Press Release*

113.    On May 19, 2021, the Company circulated a press release which stated that "Astra also shared plans to launch payloads up to 500kg to a 500 km, mid-inclination (50 degree) orbit. This capability expands the services Astra can deliver for mega constellations, small satellite companies, and government agencies."

114.    The statements referenced in ¶ 113 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the plan to increase payload capacity to 500 kg relied on an agreement with Firefly under which the Company would manufacture Reaver engines using Firefly's IP; (2) the terms of the Firefly agreement effectively capped the Company's potential payload capacity at 500 kg to ensure that the Company would be unable to compete with Firefly and other small launch providers that can handle payload capacities greater than 500 kg; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *June 8, 2021 Merger Proxy Statement*

115.     On June 8, 2021, the Company filed the Merger Proxy Statement with the SEC. Defendants McCaw, Russell, Ednie, Salemme, Weibling, Perry, and Massey solicited the Merger Proxy Statement, which contained material misstatements and omissions.

116.     The Merger Proxy Statement asked Holicity shareholders to vote, *inter alia*, to: (1) approve the business combination agreement; (2) approve a plan, for the purposes of complying with the applicable listing rules of NASDAQ, to issue 146,719,872 shares of New Astra Class A common stock in connection with the Merger, 20 million shares to be issued in connection with certain subscription agreements, and 56,280,128 shares of New Astra Class B common stock in connection with the Merger (the "Stock Issuance Proposal"); and (3) approve a plan (the "Incentive Plan") to reserve a total of 36,765,000 shares of New Astra Class A common stock for issuance under the Incentive Plan to the Company's employees and non-employee directors and consultants as award compensation (the "Incentive Plan Proposal").

117.     The Merger Proxy Statement misrepresented the Company's ability to achieve daily launches by 2025:

> Upon ramping up operations, Astra will be able to deliver launches on an almost-daily basis, which is significantly more frequent than any of its peers' capabilities.

> \* \* \*

> Astra has a competitively differentiated market offering for its customers centered around its rapid cadence of launches, bespoke range of orbital destinations, global scale and affordability. Upon ramping up operations, Astra will be able to deliver launches on an almost-daily basis, which is significantly more than any of its peers' capabilities.

> \* \* \*

> We aim to achieve a monthly launch cadence by the end of 2021 and approach a daily launch cadence by the end of 2025.

> \* \* \*

We are on track to begin commercial launch operations in 2021, with a goal of reaching a once-daily launch cadence by the end of 2025.

118.     The Merger Proxy Statement also stated the following regarding the Company's

goal to increase payload capacity:

As part of our strategy, we plan to increase the maximum payload capacity of our rocket from approximately 50 kg in 2021 to up to 500 kg for a mid-inclination 500 km orbit by late 2023, which would make us a more compelling alternative for Big LEO constellation deployment and satellite replenishment. This payload capacity improvement will come from numerous improvements, enhancements and modifications to our rocket.

* * *

We plan to increase the maximum payload capability of our rocket from approximately 50 kg in 2021 to up to 500 kg for a mid-inclination 500 km orbit by late 2023, through a process of iterative development and improvement.

119.     The Merger Proxy Statement was materially misleading because it failed to disclose

that: (1) the total addressable market for small satellite launches precluded the Company's ability

to have a daily launch cadence by 2025; (2) the plan to increase payload capacity to 500 kg relied

on an agreement with Firefly under which the Company would manufacture Reaver engines using

Firefly's IP; (3) the terms of the Firefly agreement effectively capped the Company's potential

payload capacity at 500 kg to ensure that the Company would be unable to compete with Firefly

and other small launch providers that can handle payload capacities greater than 500 kg.

120.     Due to the false and misleading elements of the Merger Proxy Statement, Holicity

shareholders voted, *inter alia*, to: (1) approve the business combination agreement; (2) approve

the Stock Issuance Proposal; and (3) approve the Incentive Plan Proposal, allowing the Individual

Defendants to breach their fiduciary duties to the Company and become greatly unjustly enriched.

121.     As a direct result of Defendants McCaw's, Russell's, Ednie's, Salemme's,

Weibling's, Perry's, and Massey's misrepresentations and omissions in the Merger Proxy

Statement, Holicity shareholders were deprived of their right to make an informed redemption decision regarding their Holicity shares prior to the Merger and were induced to accept inadequate consideration for the Merger.

**June 23, 2021 Fireside Chat with IPO Edge**

122.    On June 23, 2021, the Company filed a current report on Form 8-K with the SEC, attached to which was a transcript of a fireside chat with IPO Edge and the accompanying slide presentation. During the fireside chat, Defendants Kemp and Brannon discussed the Company's goal of daily space delivery in 2025, stating, in relevant part:

> That will provide to customers I think at some point there's an inflection point where, if we start to reach daily space delivery, which is our goal in 2025 it changes the entire market because, instead of having to book a year in advance you can think about getting to space, so much the same way you think about booking a commercial airline ticket and I think that that will create more investment and more opportunity in the marketplace then then we're even seeing today.
>
> Now, one of the big differences between astra and our competitors is since day one we've always believed in the idea of daily space delivery, we believed in this market and we've made the investments.
>
> * * *
>
> Hundreds of companies all want to go on different schedules to different places and space isn't one destination. And I think that's a big part of it, also the mega constellations they're not just in one place. There in a lot of different orbital planes they're built out over time they're different altitudes each of those is another launch opportunity.
>
> And so, as this market grows, you know, for every Airbus 3D that takes off or triple seven that takes off at the airport, how many small aircraft take off.
>
> For every container ship that pulls up at the port, how many trucks pickup those containers and deliver them. We're building the truck you know we're building the commuter jet I think if you believe in space you've got to believe that that that same the same dynamics that you see here in logistics on the ground apply.

123.    The statements referenced in ¶ 122 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading.

Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's plan to "reach daily space delivery" was unsupported by the total addressable market and (2) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *August 13, 2021 10-Q*

124.    On August 13, 2021, the Company filed a quarterly report with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2021 (the "2Q 10-Q"). The 2Q 10-Q was signed by Defendants Kemp and Brannon, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Kemp and Brannon attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

125.    The 2Q 10-Q touted the Company's operations and efficiencies, stating that "[o]ur rocket requires a launch site with little more than a concrete pad and only six Astra employees on-site, leveraging our highly automated launch operations, and our production system is designed to scale efficiently to **hundreds of launches per year.**" (Emphasis added).

126.    The statements referenced in ¶ 125 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's plan to conduct "hundreds of launches per year" was unsupported by the total addressable market and (2) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

127.   The 2Q 10-Q also set forth the following risk factors concerning the Company's ability to achieve a daily launch cadence by 2025:

> Our ability to achieve a near-daily launch cadence by 2025 will depend on our ability to add new launch sites... We have in the past and may in the future experience delays in our efforts to secure additional launch sites around the globe. Challenges as a result of regulatory processes or in our ability to secure the necessary permissions to establish these launch sites could delay our ability to achieve our target cadence and could adversely affect our business.

> \* \* \*

> Our ability to achieve this increased launch cadence within the timeframe in which we hope to do so will depend on our ability to secure the necessary regulatory licenses from the FAA, the FCC and other regulatory authorities. To our knowledge, the applicable regulatory authorities to date have not granted such licenses to a company endeavoring to launch rockets with such frequency, and as a result our business is dependent upon a regulatory framework that is untested and unprecedented.

> \* \* \*

> Further, launch operations within restricted airspace requires advance scheduling and coordination with government agencies and range owners and other users, and any high priority national defense assets will have priority in the use of these resources, which may impact our cadence of our launch operations or could result in cancellation, launch facility transfers, additional costs or rescheduling.

> \* \* \*

> If we commercialize outside the United States, we will be exposed to a variety of risks associated with international operations that could materially and adversely affect our business . . . . [including] the need for U.S. government approval to operate our spaceflight systems outside the United States.

> \* \* \*

> If our operations continue to grow as planned, of which there can be no assurance, we will need to expand our sales and marketing, research and development, customer and commercial strategy, products and services, supply, and manufacturing and distribution functions. We will also need to continue to leverage our manufacturing and operational systems and processes, and there is no guarantee that we will be able to scale the business and the manufacture of spacecraft as currently planned or within the planned timeframe.

* * *

> Our continued growth could increase the strain on our resources, and we could experience operating difficulties, including . . . finding manufacturing capacity to produce our launch vehicles, rockets and related equipment, and delays in production and launches.

* * *

> The market for commercial launch services for small LEO satellites is not well established, is still emerging, multiple mergers and acquisitions are shifting the market, and the market may not achieve the growth potential we expect, may grow more slowly than expected, or actions of competitors may impact access to customers.

128.    The statements referenced in ¶ 127 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) one of the Company's risks was not executing on its plan to achieve daily launches by 2025 given the total addressable market and (2) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

129.    Under the heading titled "Lowering Manufacturing Costs and Increasing Payloads," the 2Q 10-Q stated the following:

> We aim to be the most cost-efficient dedicated orbital launch system provider. We plan to increase the maximum payload capability of our rockets from approximately 50 kg for our first commercial flight to up to 500 kg for a mid-inclination 500 km orbit, which we believe will make Astra a compelling option for low Earth orbit constellation deployment and replenishment.

130.    The statements referenced in ¶ 129 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the plan to increase payload capacity to 500 kg relied on an agreement with Firefly under which the Company would manufacture Reaver engines using Firefly's IP; (2) the terms of the Firefly agreement effectively

41

capped the Company's potential payload capacity at 500 kg to ensure that the Company would be unable to compete with Firefly and other small launch providers that can handle payload capacities greater than 500 kg; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### September 7, 2021 Proxy Statement

131.    On September 7, 2021, the Company filed the 2021 Proxy Statement with the SEC. Defendants Kemp, London, Flournoy, Lehman, McCaw, Nelson, and Stanford solicited the 2021 Proxy Statement, which contained material misstatements and omissions.

132.    The 2021 Proxy Statement asked Company shareholders to vote, *inter alia*, to: (1) elect Defendants Kemp and London to serve until the 2024 annual meeting of shareholders; (2) to ratify the appointment of Grant Thornton LLP as Astra's independent auditor; and (3) to transact other business that may come before the meeting.

133.    The 2021 Proxy Statement said of the "Role of Board in Risk Oversight Process" that:

> Our Board has an active role, as a whole and also at the committee level, in overseeing the management of our risks. Our Board is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks and operational risks. The compensation committee is responsible for overseeing the management of risks associated with our compensation policies and practices. The audit committee is responsible for overseeing the management of risks relating to accounting matters and financial reporting. The nominating and corporate governance committee is responsible for overseeing the management of risks associated with potential conflicts of interest. Although each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through discussions from committee members about such risks. Our Board believes its administration of its risk oversight function has not negatively affected our Board's leadership structure.

42

134.    The 2021 Proxy Statement also said the following about the Company's Code of

Conduct:

> We have adopted a Code of Business Conduct and Ethics that applies to all of our
> employees, officers and directors, including our principal executive officer,
> principal financial officer and principal accounting officer. The Code of Business
> Conduct and Ethics is available on our website at www.investor.astra.com. In
> addition, we will post on our website all other disclosures that are required by law
> or the listing standards of Nasdaq concerning any amendments to, or waivers from,
> any provision of the code and policy.

135.    Moreover, the 2021 Proxy Statement said the following regarding Astra's

compensation program:

> The objective of the Company's compensation program is to provide a total
> compensation package to each NEO that will enable the Company to attract,
> motivate and retain outstanding individuals, align the interests of our executive
> team with those of our equity holders, encourage individual and collective
> contributions to the successful execution of our short-and long-term business
> strategies and reward NEOs for performance. The Board has historically
> determined the compensation for the NEOs.

136.    The 2021 Proxy Statement was materially misleading because it failed to disclose

that: (1) contrary to the 2021 Proxy Statement's descriptions of the Board's and its committees'

risk oversight functions, the Board and its committees were not adequately exercising these

functions and were causing or permitting the Company to issue false and misleading statements

about it; (2) certain Individual Defendants were violating the Code of Conduct without obtaining

waivers or else without such waivers being disclosed; and (3) certain Individual Defendants,

including those soliciting the 2021 Proxy Statement, were breaching their fiduciary duties to the

Company and its shareholders and were thus improperly interested in receiving unjust

compensation.

137.    The 2021 Proxy Statement was also materially misleading because it failed to

disclose that: (1) the Company was unable to launch from "anywhere on the planet" since domestic

launches could only take place at five commercial spaceports licensed by the FAA and international launches were unlikely to be approved because countries generally have a preference for their own member nation launch programs; (2) the Company's plan to achieve a daily or near daily launch cadence by 2025 was unsupported by the total addressable market for small satellite launches; (3) the plan to increase payload capacity to 500 kg relied on an undisclosed agreement with Firefly under which the Company would manufacture Reaver engines using Firefly's IP; (4) the terms of the Firefly agreement effectively capped the Company's potential payload capacity at 500 kg to ensure that the Company would be unable to compete with Firefly and other small launch providers that could handle payload capacities greater than 500 kg; (5) the Company faced a foreseeable risk of not executing its plan to achieve daily launches by 2025 given the total addressable market; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

138.    Due to the false and misleading elements of the 2021 Proxy Statement, Company shareholders voted, *inter alia*, to elect Defendants Kemp and London to the Board, allowing them to continue breaching their fiduciary duties to the Company.

### *October 22, 2021 10-Q/A*

139.    On October 22, 2021, the Company filed a quarterly report amendment on Form 10-Q/A with the SEC for the quarterly period ended June 30, 2021 (the "10-Q/A"). The 10-Q/A was signed by Defendants Kemp and Brannon and contained SOX certifications signed by them confirming the accuracy of the purported statements therein.

140.    The 10-Q/A stated the following about the Company's launch cadence plan: "Our rocket requires a launch site with little more than a concrete pad and only six Astra employees on-

site, leveraging our highly automated launch operations, and our production system is designed to scale efficiently to **hundreds of launches per year.**" (Emphasis added).

141. The statements referenced in ¶ 140 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's plan to conduct "hundreds of launches per year" was unsupported by the total addressable market and (2) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

142. The 10-Q/A also repeated the same risk factors concerning the Company's ability to achieve a daily launch cadence as described in ¶ 127.

143. The statements referenced in ¶ 142 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) one of the Company's risks was not executing on its plan to achieve daily launches by 2025 given the total addressable market and (2) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

144. Under the heading titled "Lowering Manufacturing Costs and Increasing Payloads," the 10-Q/A further stated the following:

> We aim to be the most cost-efficient dedicated orbital launch system provider. We plan to increase the maximum payload capability of our rockets from approximately 50 kg for our first commercial flight to up to 500 kg for a mid-inclination 500 km orbit, which we believe will make Astra a compelling option for low Earth orbit constellation deployment and replenishment.

145. The statements referenced in ¶ 144 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading.

Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the plan to increase payload capacity to 500 kg relied on an agreement with Firefly under which the Company would manufacture Reaver engines using Firefly's IP; (2) the terms of the Firefly agreement effectively capped the Company's potential payload capacity at 500 kg to ensure that the Company would be unable to compete with Firefly and other small launch providers that can handle payload capacities greater than 500 kg; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *November 11, 2021 Earnings Call*

146.    On November 11, 2021, the Company held a call to discuss Astra's third fiscal quarter. When asked about the Company's relationship with Firefly, Defendant Kemp maintained the following:

> So then finally, the question on the supplier. I think there were some articles online speculating a supplier. And I think I've discussed before, we don't discuss how we manufacture things or our suppliers publicly. But what I can tell you, and I will reiterate here, is that all intellectual property required to produce all of our technology will be owned, licensed or developed by Astra. And anything you've read is not inconsistent with this strategy. So I think that's all I can say about that at this point.

147.    The statements referenced in ¶ 146 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company had indeed entered into an agreement with Firefly to manufacture Reaver engines using Firefly's IP; (2) the plan to increase payload capacity to 500 kg relied on an agreement with Firefly under which the Company would manufacture Reaver engines using Firefly's IP; (3) the terms of the Firefly agreement effectively capped the Company's potential payload capacity at 500 kg to ensure that

the Company would be unable to compete with Firefly and other small launch providers that can handle payload capacities greater than 500 kg; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *November 15, 2021 10-Q*

148.     On November 15, 2021, the Company filed a quarterly report with the SEC on Form 10-Q for the fiscal quarter ended September 30, 2021 (the "3Q 10-Q"). The 3Q 10-Q was signed by Defendants Kemp and Brannon and contained SOX certifications signed by them confirming the accuracy of the purported statements therein.

149.     The 3Q 10-Q referenced the risk factors disclosed in the 10-Q/A and as described in ¶ 127.

150.     The statements referenced in ¶ 149 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) one of the Company's risks was not executing on its plan to achieve daily launches by 2025 given the total addressable market and (2) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

151.     Under the heading titled "Lowering Manufacturing Costs and Increasing Payloads," the 3Q 10-Q stated the following:

> We aim to be the most cost-efficient dedicated orbital launch system provider. We plan to increase the maximum payload capability of our rockets from approximately 50 kg for our first commercial flight to up to 500 kg for a mid-inclination 500 km orbit, which we believe will make Astra a compelling option for low Earth orbit constellation deployment and replenishment.

152.    The statements referenced in ¶ 151 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the plan to increase payload capacity to 500 kg relied on an agreement with Firefly under which the Company would manufacture Reaver engines using Firefly's IP; (2) the terms of the Firefly agreement effectively capped the Company's potential payload capacity at 500 kg to ensure that the Company would be unable to compete with Firefly and other small launch providers that can handle payload capacities greater than 500 kg; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### April 28, 2022 Proxy Statement

153.    On April 28, 2022, the Company filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Kemp, London, Flournoy, Lehman, and Nelson solicited the 2022 Proxy Statement, which contained material misstatements and omissions.

154.    The 2022 Proxy Statement asked Company shareholders to vote, *inter alia*, to: (1) elect Defendant Stanford to serve until the 2025 annual meeting of shareholders; (2) approve an amendment to the Incentive Plan to increase the number of shares of Class A common stock authorized for issuance under the Incentive Plan by 6,000,000; and (3) ratify the appointment of PricewaterhouseCoopers LLP as Astra's independent auditor.

155.    The 2022 Proxy Statement said of the "Board Role in Risk Oversight" that:

The Board has overall responsibility for risk oversight, including, as part of regular Board and Committee meetings, general oversight of executives' management of risks relevant to the Company. A fundamental part of risk oversight is not only understanding the material risks Astra faces and the steps management is taking to manage those risks, but also understanding what level of risk is appropriate for the Company. The involvement of the Board in reviewing Astra's business strategy is

48

an integral aspect of its assessment of management's tolerance for risk and its determination of what constitutes an appropriate level of risk for the Company. While the full Board has overall responsibility for risk oversight and is currently overseeing Astra's business continuity risks, it is supported in this function by its Audit Committee, Compensation Committee and Nominating and Corporate Governance committee. Each of the committees regularly reports to the Board.

The Audit Committee assists the Board in fulfilling its risk oversight responsibilities by overseeing the management of financial risks, such as with respect to accounting matters, liquidity and credit risks, corporate tax positions, insurance coverage, insider trading, ITAR and other regulatory compliance risk, environmental risk and cash investment strategy and results, and risks relating to the performance of internal audit function and our independent registered public accounting firm, as well as Astra's systems of internal controls and disclosure controls and procedures, along with processing information about cyber security risks and incidents, as needed. The Compensation Committee assists the Board by overseeing and evaluating Astra's compensation policies, practices, and arrangements to determine whether they encourage excessive risk-taking. The Nominating and Corporate Governance Committee assists the Board by overseeing the management of risks associated with potential conflicts of interest and overseeing and evaluating programs and risks associated with Board organization, membership and structure, management succession, and corporate governance, ITAR and related regulatory compliance and environmental matters. In addition, the Board and its Committees receive periodic detailed operating performance reviews from members of management.

156.    The 2022 Proxy Statement also said the following about the Company's Code of

Conduct:

The Board has adopted a Code of Business Conduct and Ethics (the "Code of Conduct") that, along with Astra's Second Amended and Restated Certificate of Incorporation (the "Charter"), Astra's Amended and Restated Bylaws (the "Bylaws") and the charters of the committees of the Board (the "Committees"), provide the framework for the governance of the Company. The Code of Conduct applies to all of our directors, officers, and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions, and is available on the "Governance Overview" section of Astra's investor relations website at *https://investor.astra.com*. The charters for all of our Committees as well as our Corporate Communications Policy and Whistleblower and Complaint Policy are also available on the "Governance Overview" section of Astra's investor relations website at *https://investor.astra.com*. In addition, we will post on our website all other disclosures that are required by law or the listing standards of Nasdaq concerning any amendments to, or waivers from, any provision of the Code of Conduct.

157.     The 2022 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it; (2) certain Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) certain Individual Defendants, including those soliciting the 2022 Proxy Statement, were breaching their fiduciary duties to the Company and its shareholders and were thus improperly interested in receiving unjust compensation.

158.     The 2022 Proxy Statement was also materially misleading because it failed to disclose that: (1) the Company was unable to launch from "anywhere on the planet" since domestic launches could only take place at five commercial spaceports licensed by the FAA and international launches were unlikely to be approved because countries generally have a preference for their own member nation launch programs; (2) the Company's plan to achieve a daily or near daily launch cadence by 2025 was unsupported by the total addressable market for small satellite launches; (3) the plan to increase payload capacity to 500 kg relied on an undisclosed agreement with Firefly under which the Company would manufacture Reaver engines using Firefly's IP; (4) the terms of the Firefly agreement effectively capped the Company's potential payload capacity at 500 kg to ensure that the Company would be unable to compete with Firefly and other small launch providers that could handle payload capacities greater than 500 kg; (5) the Company faced a foreseeable risk of not executing its plan to achieve daily launches by 2025 given the total addressable market; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant

50

times.

159.     Due to the false and misleading elements of the 2022 Proxy Statement, Company

shareholders voted, *inter alia*, to: (1) elect Defendant Stanford to the Board, allowing him to

continue breaching his fiduciary duties to the Company and (2) approve an amendment to the

Incentive Plan to increase the Class A common stock authorized for issuance under the Incentive

Plan by 6,000,000 shares.

### The Truth Emerges

*December 29, 2021 Kerrisdale Report*

160.     On December 29, 2021, Kerrisdale Capital published the Kerrisdale Report,

revealing significant issues that plagued Astra and Legacy AS.

161.     The Kerrisdale Report discredited Astra's claims that it could launch vehicles

anywhere, stating in relevant part:

> Management habitually describes Astra as having the flexibility to launch from
> "anywhere in the world," which is simply not true. Just because a rocket can be
> transported in a shipping container – doesn't mean one can lift off from any
> Walmart parking lot. In the US, Astra can only launch from an FAA-licensed
> commercial spaceport approved for vertical launch. There are only 5 such sites
> (plus SpaceX's private Boca Chica spaceport) located in the U.S. 97% of launches
> over the last 40 years have been from only 2 launch sites: Cape Canaveral spaceport
> (30 launches in 2020) and Vandenberg Space Force Base (1 launch in 2020). For a
> company aiming to launch hundreds of rockets per year, the reliance on a small
> handful of key spaceports is a bottleneck that threatens its whole business model.
> While there are ongoing modernization efforts at Cape Canaveral and the FAA is
> streamlining launch licensing requirements, these efforts can get bogged down in
> bureaucratic quagmires.
>
> Due to the fact vertical launch vehicles drop one or more stages downrange,
> ***creating a hazard to life and property in the drop zones, vertical launches must
> take place near bodies of water (like Cape Canaveral) or in remote locations
> (Spaceport America, adjacent to White Sands Missile range in New Mexico).***
>
>                              * * *
>
> Perhaps in recognition of the challenge in finding sufficient domestic spaceport
> access, the company has described working hard to secure launch sites

internationally. International space agencies, trade groups, and regulatory bodies are working on various fronts to improve spaceport availability, but these efforts generally lag that of the US and have encountered their own challenges from local politicians and environmentalists. ***How and if a US company with a US rocket would be granted approval – when many countries typically assign preference to supporting their own member nation launch programs – is also uncertain***. With so much focus on scaling manufacturing processes and launch cadence, the seemingly mundane issue of finding somewhere to launch is a risk to Astra's long-term vision because contrary to management's oft repeated claim – ***Astra can't launch from anywhere.***

(Emphasis added.)

162.    The Kerrisdale Report further disclosed that the Company's assumptions about its

projections and addressable market were, among other things, "absurd" stating that:

Astra's investor pitch boils down to selling the pipedream of an unprecedented number of cheap rocket launches. Astra's forecast calls for 300 launches per year by 2025, a whopping 10x more than SpaceX achieved in 2021. Management markets this exceptionally aspirational goal (which we view as pure fantasy) in a bid to spread its expensive Bay Area manufacturing costs over enough rockets in order to turn a profit. A reality check is in order: To date, Astra has managed just one successful orbital test flight. If Astra's five-year projection of almost daily successful launches of rockets made with non aerospace grade parts does not sound improbable enough, it ignores an even graver problem with Astra's projection – not one expert whom we interviewed, nor any independent market study we reviewed, offered any reason to think that, industry-wide, sufficient market demand will exist for Astra to sustain approximately daily launches by 2035, let alone 2025.

* * *

**Financial Projections Rely on Absurd Market Assumptions**
Astra's financial forecasts rely on launching an astounding 165 rockets by 2024 and 300 rockets by 2025. ***To put these figures in context, 300 launches is 10x the total number of US commercial launches in 2022. 300 is nearly triple the total number of launches conducted globally in 2020.*** Incredibly, despite the obvious engineering, manufacturing, logistical, and regulatory challenges hitting such a cadence would represent, Astra felt it appropriate to issue this outlook before successfully reaching orbit even once.

**Planned Daily Launch Cadence Far Exceeds Addressable Market**
[…] Astra touted big picture themes like "$1 trillion+ Total Space Economy in 2040" (from Morgan Stanley), and a misleading slide that shows a large increase in the cumulative number of satellites to be launched in the coming years, but without specifying Astra's niche role in this economy and the true addressability

for a rocket with only a 500kg payload capability (eventually). It's a significant red flag with a simple explanation: every legitimate market study that Astra could include would only show its projections to be laughably unrealistic – so Astra just left them out.

* * *

Below we walk through an analysis to determine a more refined view of the market opportunity for Astra as it strives to establish daily launch in 2025. We begin with NSR's estimate of the total number of non-GEO satellites to be launched in 2025 (2,255). We then apply two simple filters: 1) we exclude 90% or 851 of NSR's North American communications satellites forecast to account for Starlink (SpaceX launched 850 Starlink satellites in 2020), 2) we deduct 90% of satellites from Asia and 20% from Europe based on the contribution to these regions from Chinese and Russian satellites.

### Astra 2025E Launch TAM

|                                    | 2025E  |
| ---------------------------------- | ------ |
| Total Non-GEO Satellite Launches   | 2,255  |
| Less: NA Communications            | (851)  |
| Less: 90% Asia (China)             | (792)  |
| Less: 20% of Europe (Russia)       | (25)   |
| Total Addressable Non-GEO Satellites | 587  |

Source:  Kerrisdale analysis and Northern Sky Research, Global Satellite Manufacturing and Launch Markets 11th Edition, July 2021.

At less than 600 satellites, the entire non-captive TAM for launch is easily supported by less than 100 total launches. SpaceX rideshare recently set a record for 134 satellites on a single mission. *Juxtapose a potential addressable market of less than 100 launches in aggregate, with Astra's projection of conducting 300 launches themselves when there are dozens of competitors, and one can see why our conversations with a range of industry participants yielded the following comments regarding Astra's plans*:

"*I laugh at that number . . . . There's no way they are doing 300 launches by 2025; by 2035 it would still be a stretch*." — Senior Engineer, launch broker
"We are, all around in the industry, in the same spot. *Even within Astra and at [our small launch company], I'm looking at [1/10th Astra's number] rockets,*

53

*and we are freaking out – are we really going to have enough customers for this?"* — Senior Engineer, small launch provider

"Happy they got to orbit on last launch a few weeks ago, that's great, but ***there's just a lot of issues with their rocket and their business model***…claims of launching every day? It's pretty exciting when a launch provider can launch once a month – and sure, ***everyone would love for rockets to be like airplanes – that's not going to happen for at least another decade***. So yes, I have some serious concerns about Astra's claims." — Mission Manager for a broadband mega-constellation … We believe there will always be some level of interest in a service that can regularly/flexibly bring a handful of smallsats to a specific orbital location, even at a premium price to rideshares – but that is a niche offering in a highly competitive field ***It is not an addressable market that comes anywhere near supporting 300 launches per year for a single company with Astra's limited capabilities***.

\* \* \*

This is because ***while satellite volumes are increasing, launch pricing is under constant deflationary pressure (the latter is enabling the former).***

***Competition from new entrants and from larger rideshare players lowering price, cost efficiencies from reusable launchers, and improvements in technology and operations all conspire to exert downward pressure on price***. Taken together, we estimate a total launch market value that averages ~$13bn per year over the next several years, with a whopping 85% accounted for in constellations, where larger launch vehicles enjoy economies of scale, leaving an annual TAM for a small launcher like Astra in the $~2 billion dollar range. Astra's 2025E launch revenue forecast of $1.125bn assumes it can hold ASP constant at $3.75m and rise in 4 years to become the dominant player in the small launch market. Either NSR is too pessimistic (which anyone who has followed the industry knows is not usually how industry projections work) or, as we would contend, the projections of a new space SPAC, announced at the height of the bubble (two days before Virgin Galactic hit its all-time high of $62) is complete fantasy.

***Without High Launch Cadence, Astra's Business Model Falls Apart […] The problem lies in the unit economics of launch. […]***

\* \* \*

***Investors should be asking whether Astra devised a launch cadence to meet market demand or to merely solve for the inherent weaknesses in its business model?*** Our research, supported by a range of interviews with key industry players, point strongly to the latter. ***Astra took full advantage of the lack of scrutiny SPACs enjoyed earlier this year relative to traditional IPOs, passed off a launch cadence without any supporting market demand, and sold equity in a bubble that has now burst.*** As a launch services broker with direct insight into

54

market trends on a global basis described, "we get it, it was a cash grab…but how are you not going to squander all this money? Astra is all show and it's not clear where they're going to go aside from just building a bunch of stuff."

(Emphasis added.)

163.    The Kerrisdale Report stated the following regarding the Company's designs:

Its main competitors will soon be launching larger 1,000kg+ payload rockets while Astra has yet to overcome developmental hurdles necessary to successfully launch even a single satellite into any of the emerging broadband mega constellations. Shortly after Astra announced its SPAC merger, the company increased its payload capacity goal (not a trivial matter in rocket programs) and signed a "secret" deal with a competitor for access to some of the competitor's more powerful engine IP – both clear signs that Astra is struggling to keep pace with market leaders. Moreover, Astra shortsightedly relies on cheap, off-the-shelf commercial parts – a strategy that precludes it from exploiting the economic advantages that its more sophisticated competitors enjoy by developing reusable rockets that in the long run reduce expenses. Consequently, Astra remains strikingly vulnerable to the relentless price deflation that characterizes today's launch market.

* * *

**Undersized and Not Reusable: Astra is Falling Behind Industry Trends**

Not only is the overall addressable market Astra has promoted vastly overstated – Astra's development path is on the wrong side of key trends within the industry: larger payloads and reusability.

Most of the increase in mass-to-orbit in the coming decade will be as part of large broad band constellations. According to NSR, nearly 80% of all non-GEO satellites from now until the end of the decade will be part of constellations of communications smallsats. Smallsat manufacturers are taking advantage of declining launch costs to build larger, more sophisticated constellations of satellites which generally have more mass than previous iterations.

* * *

Now examine Astra's development path and some of the changes it has announced only months into being a public company. At the time of the SPAC announcement 10 months ago, Astra's stated goal was a 300kg payload to 500km Sun-Synchronous Orbit by 2023. By 2025, it hoped a vehicle that can "throw about 300 kilograms to a reference orbit" would be launched daily. Only 3 months later however, in conjunction with the Planet launch agreement, Astra announced a new goal: 500kg to 500km LEO. Why the sudden change? Because according to experts in the industry, management likely knew that to make good on claims that

Astra could "meet the needs of all these mega-constellations like Kuiper", it needed a rocket with more than just a 300kg payload.

***Announcing a 66% jump in payload capacity is not a trivial matter in rocket development.*** It involves meaningful redesign work with new components and a more powerful engine – one that apparently Astra did not have. As a sign of Astra's unpreparedness, four months after the new 500kg objective, ***Astra signed a "secret" deal to purchase the IP for an engine powerful enough to launch this new 500kg payload from its competitor, Firefly Aerospace (more on this later).***

Even with this shortcut, Astra will still only have a rocket two years from now that is able to launch 1 Project Kuiper satellite, barely 2 Project Pelican satellites from Planet, and zero Gen2 Starlink satellites.

\* \* \*

In addition to higher payloads, rockets that are partially or fully reusable continue to lower the cost profile of the launch industry. In the conference call announcing Astra's SPAC merger, management claimed the unit economics of mass manufacturing small rockets could match that of a large rocket. Below we walk through how that falls apart once one factors in the marginal cost of SpaceX's reusable Falcon 9 and planned Starship.



| Marginal Cost Benefit of Reusable Rockets | | | |
|---|---|---|---|
| | **ASTRA** | **SPACEX** | |
| | Rocket 5 | Reusable Falcon 9 | Marginal Cost Falcon 9 Starship |
| BOM + Labor Cost ($ M) | $1 | $28 | $15    $2 |
| Payload to LEO (kg) | 500 | 13,680 | 13,680    100,000 |
| $/kg Production Cost | $2,000 | $2,047 | $1,096    $20 |
| Timeframe | 2025 | Now | Now    2022/23 |

*Source: Astra investor presentations, public comments from* [Elon Musk](#)*, Kerrisdale Analysis.*

[...] After the maiden voyage however, Musk has stated the marginal cost of refurbishing and launching a reusable Falcon 9 drops to only $15m. Applied against a 13,680kg payload, (a reduction of 40%) to account for the reusability of the booster and fairing, and now the incremental cost of production is nearly half that

of Astra's target for 2025. The cost advantage for a re-used Starship is even more dramatic. Musk has outlined the possibility Starship may fly for a marginal cost of just $2m, a staggering $20/kg, orders of magnitude cheaper than anything Astra can hope to achieve (even if one discounts Musk's hyperbolic tendencies).

Other small launchers in the industry are following SpaceX's path to capture these economics. Rocket Lab's Electron is being evolved to become partially reusable using parachutes and mid-air recapture, while its Neutron rocket will be partially reusable thanks to propulsive landing. Relativity Space aims to start flying a fully re-usable, 3D-printed Terran R rocket in 2024. VC start-ups like STOKE are developing reusable rockets. Astra on the other hand, a company with a corporate slogan of "Improve life on Earth from Space," and a CEO with a "vision of a healthier" planet has no path to developing a reusable rocket, and apparently does not see a problem with having hundreds of rockets land in the ocean every year.

* * *

**"Secret" Firefly Engine Deal is Sign of Weakness**
On September 21, the tech blog TheVerge.com, reported that Astra agreed to acquire the right to manufacture rocket engines in-house from launch competitor, Firefly Aerospace, for roughly $30m. The article references internal Firefly documents viewed by the publication and includes specifics which suggest the agreement was leaked by Firefly. Though Astra's CEO and VP of Communications declined to comment on certain specifics of the agreement, neither disputed its existence (there is no mention of this material agreement in Astra's SEC filings and no press releases were ever issued by either company). When asked on the last quarterly call about the reported Firefly relationship, management once again did not disclaim the existence of the agreement, stating that anything the analyst had read online was "not inconsistent" with a strategy of all technology being "owned, licensed, or developed by Astra.

***So why the cloak and dagger? Perhaps Astra is aware that buying the IP for the most critical piece of hardware on a rocket from a direct competitor is not exactly a good look***. …

Unsurprisingly, when doing a deal with a competitor, the agreement has some important restrictions. ***The IP agreement allegedly includes a clause that only allows Astra to use two Reaver engines per rocket – enough to hit Astra's goal of 500kg to 500km – but no more. Recall that Firefly is developing a 630kg- 1,000kg rocket, and therefore the agreement caps Astra's use of the IP just below Firefly's capability and the emerging sweet spot for smaller launchers. Firefly seems content to help Astra for a price – but it isn't foolish enough to solve a direct competitor's problem of being undersized***.

(Emphasis added.)

164.    On this news, the price of the Company's common stock fell approximately 14%, or $1.10 per share, from closing at $7.71 per share on December 28, 2021, to close at $6.61 per share on December 29, 2021.

### June 12, 2022 TROPICS Launch

165.    On June 12, 2021, pursuant to a February 2021 launch contract with NASA, the Company attempted to launch two Time-Resolved Observations of Precipitation ("TROPICS") satellites into an orbit above Earth. The launch, however, was unsuccessful, with the engine shutting down before the rocket could attain enough velocity to reach a stable orbit.

166.    On this news, the price of the Company's common stock fell approximately 24%, or $0.48 per share, from closing at $2.02 per share on Friday, June 10, 2022 to close at $1.54 per share on Monday, June 13, 2022.

### August 4, 2022 Press Release and Earnings Presentation

167.    On August 4, 2022, the Company issued a press release announcing that, given how only "two of its four Rocket 3.3 flights were successful, the Company will transition to the next version of its launch system and is working with customers to re-manifest all payloads onto the new launch system." The "next version of its launch system" will aim to increase payload capacity to 600 kg instead of 500 kg, a change which confirms the Kerrisdale Report's conclusion that the Company's 500 kg payload capacity goal was "on the wrong side of key trends within the industry: larger payloads and reusability."

168.    That same day, the Company attached an earnings presentation to a current report filed on 8-K with the SEC on August 4, 2022. The earnings presentation explained that the planned increase to a 600 kg payload capacity would allow the Company to compete for 75% of the total addressable market for small satellite launches instead of just 45%. The earnings presentation also

explained that "[g]iven the increasing demand from large constellation operators for higher capacity, lower cost, and more reliable launch services, our discussions with NASA and other customers, we have increased our payload capacity target for Launch System 2.0 from 300kg to 600kg."

169.    On this news, the price of the Company's common stock fell approximately 18%, or $0.28 per share, from closing at $1.58 per share on August 4, 2022 to close at $1.30 per share on August 5, 2022.

### *October 7, 2022 Deficiency Notice*

170.    On October 7, 2022, the Company disclosed in a current report filed on Form 8-K with the SEC that the Company received a deficiency notice from NASDAQ because the Company's "per share closing bid price has been below $1.00 for the last thirty consecutive business days." The Company has until April 4, 2023 to regain compliance with NASDAQ's listing requirements. Altogether, Astra has lost more than 95% of its market value.

### THE INDIVIDUAL DEFENDANTS' KNOWLEDGE AND MOTIVATION

171.    As Defendant Kemp entered into the Firefly agreement, he had actual knowledge of the Firefly agreement when publicly stating the Company's goal of increasing the payload capacity of the Company's rockets to 500 kg by 2025.

172.    Moreover, as demonstrated by an investor presentation filed with the SEC on February 2, 2021 in which Defendants touted their "instant and persistent access to data," Defendants at all times had access to data which contradicted their public statements.

173.    At the time Defendants' public statements about the Company's plan to conduct daily or near daily launches by 2025 were made, Defendants knew that the Company would not

be able to follow through on such plan, as demonstrated by the earnings presentation explaining the planned increase to 600 kg payload capacity in ¶ 168.

174.    In 2020, Defendant Kemp was issued 5,250,000 shares of Legacy Astra Class A common stock and an option to acquire 10,000 stock options and Defendant London was issued 1,750,000 shares of Legacy Astra Class A common stock, all of which were fully vested at the time of grant. For the fiscal year ended December 31, 2020, Defendant Kemp received $23,572,500 in stock awards and Defendant London received $7,857,500 in stock awards.

175.    Concurrent with Series C Financing, on January 28, 2021, Defendants Kemp and London entered into a stock purchase agreement with certain investors, including ACME SPV AS, LLC, whereby Defendant Kemp sold a total of 3,775,879 shares of Founders Preferred Stock for a total purchase price of $25.0 million while Defendant London sold a total of 2,265,529 shares of Founders Preferred Stock for a total purchase price of $15.0 million. ACME SPV AS, LLC, which Defendant Stanford is affiliated with, purchased 1,821,485 shares of Founders Preferred Stock from Defendant Kemp for a total purchase price of $12.1 million. In connection with the Merger, Defendant Kemp's annual base salary was increased from $256,000 to $600,000 and Defendant London's annual base salary was increased from $227,000 to $400,000.

176.    In December 2020, Defendant Brannon received a grant of 1,500,000 stock options in connection with the commencement of her employment with Astra. On April 23, 2021, the Board accelerated vesting of all of Defendant Brannon's stock options, which were subsequently immediately exercised and sold to unaffiliated investors in the secondary market. In anticipation of the Merger, Astra entered into a new employment agreement with Defendant Brannon, under which Defendant Brannon's annual base salary increased from $330,000 to $400,000 and she also

became eligible to earn an annual bonus with a target equal to 75% of her base salary. Thus, these Defendants were especially motivated to perpetuate the fraud.

177.    Additionally, prior to the Merger, certain of the Individual Defendants were employed by Pendrell Corporation ("Pendrell"). Defendant McCaw has served as Pendrell's Chairman since 2000 and as Pendrell's Co-CEO since October 2018. Defendant Ednie has served as Pendrell's CFO since September 2014. Defendant Russell joined Pendrell in November 2019 as the CEO and co-Founder of a newly formed Pendrell subsidiary. Defendant Salemme has served as Pendrell's Co-CEO and Director since October 2018 and has served in various capacities for Pendrell since 2011.

178.    On June 4, 2020, prior to the consummation of the IPO, Pendrell paid an aggregate purchase price of $25,000 in exchange for the issuance of 7,187,500 shares of Holicity Class B common stock (the "Founder Shares"). Accordingly, Pendrell paid approximately $0.003 per Founder Share. On June 9, 2020, Pendrell transferred the Founder Shares to X-icity Holdings Corporation (the "Sponsor"), a subsidiary of Pendrell.

179.    In July 2020, the Sponsor subsequently transferred 30,000 Founder Shares each to Defendants Weibling, Perry, and Massey, 150,000 Founder Shares to Defendant McCaw, 100,000 Founder Shares to Defendant Russell, 80,000 Founder Shares to Defendant Salemme, 40,000 Founder Shares to Defendant Ednie, and 239,000 Founder Shares to other directors, officers, employees and consultants of Pendrell, in each case for approximately the same per-share price as initially paid by the Sponsor. The July 2020 transfer resulted in the Sponsor holding 6,488,500 Founder Shares.

180.    On August 4, 2020, Holicity effectuated a 1.1-for-1 Class B common stock split, resulting in Defendants Weibling, Perry, and Massey each holding 33,000 Founder Shares,

Defendant McCaw holding 165,000 Founder Shares, Defendant Russell holding 110,000 Founder Shares, Defendant Salemme holding 88,000 Founder Shares, Defendant Ednie holding 44,000 Founder Shares, other directors, officers, employees and consultants of Pendrell holding 262,900 Founder Shares, and the Sponsor holding 6,731,100 Founder Shares. As there were no redemption rights or liquidating distributions with respect to the Founder Shares, the Founder Shares would have expired as worthless if Holicity failed to complete a business combination within 24 months from the closing of the IPO, or August 7, 2022.

181.   As each Founder Share was purchased for approximately $0.003 but would be rendered worthless if Holicity failed to complete a business transaction by August 7, 2022, Defendants McCaw, Ednie, Russell, Salemme, Weibling, Perry, and Massey were financially motivated to ensure that Holicity merged with almost any company by the prescribed deadline to achieve significant returns on their investment. Upon the closing of the Merger, each Founder Share converted into a share of Class A common stock.

182.   Also, in conjunction with the closing of the IPO, Holicity consummated the sale of 5,333,333 private placement warrants at a price of $1.50 per warrant in a private placement to the Sponsor. The warrants are each exercisable commencing the later of 30 days following the closing of the Merger and 12 months from the closing of the IPO for one share of Holicity Class A common stock at $11.50 per share. If Holicity failed to complete a business combination by August 7, 2022, then the proceeds from the sale of the private placement warrants would have been part of the liquidating distribution to the public shareholders and the warrants held by the Sponsor would have been worthless.

## DAMAGES TO ASTRA

183.    As a direct and proximate result of the Individual Defendants' conduct, Astra will lose and expend many millions of dollars.

184.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection to the conduct discussed herein.

185.    In addition, such losses include the value for which Holicity was made to overpay for acquiring Legacy AS, which was acquired on terms unreasonable to Holicity given the undisclosed truth.

186.    Additionally, these expenditures include, but are not limited to, unjust compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

187.    As a direct and proximate result of the Individual Defendants' conduct, Astra has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and other misconduct.

## DERIVATIVE ALLEGATIONS

188.    Plaintiff brings this action derivatively and for the benefit of Astra to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof.

189.    Astra is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

190.    Plaintiff is, and has been at all relevant times, a shareholder of the Company. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

191.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

192.    A pre-suit demand on the Board of Astra is futile and, therefore, excused. At the time of filing of this amended complaint, the Board consists of the following six individuals: Defendants Kemp, London, Flournoy, Lehman, Nelson, and Stanford (collectively, the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of the six Director-Defendants who are on the Board at the time of the filing of this amended complaint.

193.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make false and misleading statements and omissions of material fact. These actions render the Director-Defendants unable to impartially investigate the charges and decide whether to pursue an action against themselves and the other perpetrators of this scheme.

194.    Moreover, as discussed below, the Director-Defendants are controlled by and beholden to Defendants Kemp and London, who are majority shareholders of the Company and control the Director-Defendants' continued positions at Astra. For this reason, too, the Director-

Defendants would not be able to make a demand against Defendants Kemp and London with the requisite level of impartiality.

195.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

196.    Additional reasons that demand on Defendant Kemp is futile follow. Defendant Kemp has served as the CEO of Astra and as Chairman of the Board since June 2021. He previously served in the same capacities at Legacy AS, which he co-founded. The Company provides Defendant Kemp with his principal occupation for which he receives substantial compensation as detailed above. For that reason, too, he would be unable to make a demand against Defendants Stanford, Lehman, and Nelson, who are responsible for apportioning his compensation. Thus, as the Company admits, he is a non-independent director. As CEO, Defendant Kemp is ultimately responsible for the false and misleading statements and omissions that were made leading up to and after the Merger, including those in the 2Q 10-Q, 10-Q/A, and 3Q 10-Q, which he personally signed and signed SOX certifications for, and statements that he personally made during earnings calls. The 2021 Proxy Statement was also solicited on his behalf and the false and misleading elements contained therein contributed to his reelection to the Board. The 2022 Proxy Statement was also solicited on his behalf and the false and misleading elements contained therein led to Defendant Stanford's reelection to the Board and shareholders approving an amendment to the Incentive Plan to increase the Class A common stock authorized for issuance

under the Incentive Plan by 6,000,000 shares. Moreover, Defendant Kemp entered into, and thus had knowledge of the Firefly agreement when misrepresenting the Company's goal of increasing payload capacity to 500 kg by 2025. As the Company's highest officer and as a trusted Company director, Defendant Kemp conducted little, if any, oversight of the schemes to engage in the Overpayment Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Kemp is a defendant in the Securities Class Action. For these reasons, Defendant Kemp breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.   Additional reasons that demand on Defendant London is futile follow. Defendant London, like Defendant Kemp, co-founded Legacy AS and serves in an executive capacity (as CTO) at Astra and as a Company director since June 2021.  Thus, his primary source of livelihood is tied to the compensation he receives from the Company. For that reason, too, he would be unable to make a demand against Defendants Stanford, Lehman, and Nelson, who are responsible for apportioning his compensation. As the Company recognizes, this renders him not independent.  As a trusted Company director, Defendant London conducted little, if any, oversight of the schemes to cause the Company to engage in the Overpayment Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. He further solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to his reelection to the Board. The 2022 Proxy Statement was also solicited on his behalf and the false and misleading elements contained therein led to Defendant Stanford's reelection to the

Board and shareholders approving an amendment to the Incentive Plan to increase the Class A common stock authorized for issuance under the Incentive Plan by 6,000,000 shares. Moreover, Defendant London is a defendant in the Securities Class Action. For these reasons, Defendant London breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.    Additional reasons that demand on Defendant Flournoy is futile follow. Defendant Flournoy has served as a Company director since August 2021. She also serves as Chair of the Nominating and Corporate Governance Committee. As a trusted Company director, Defendant Flournoy conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Flournoy solicited the 2021 Proxy Statement. The false and misleading elements of the 2021 Proxy Statement contributed to the reelection of Defendants Kemp and London as directors. The 2022 Proxy Statement was also solicited on her behalf and the false and misleading elements contained therein led to Defendant Stanford's reelection to the Board and shareholders approving an amendment to the Incentive Plan to increase the Class A common stock authorized for issuance under the Incentive Plan by 6,000,000 shares. For these reasons, Defendant Flournoy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

199.    Additional reasons that demand on Defendant Lehman is futile follow. Defendant Lehman has served as a Company director since June 2021. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. As a trusted Company director,

Defendant Lehman conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Lehman solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to the reelection of Defendants Kemp and London to the Board. The 2022 Proxy Statement was also solicited on his behalf and the false and misleading elements contained therein led to Defendant Stanford's reelection to the Board and shareholders approving an amendment to the Incentive Plan to increase the Class A common stock authorized for issuance under the Incentive Plan by 6,000,000 shares. For these reasons, Defendant Lehman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.    Additional reasons that demand on Defendant Nelson is futile follow. Defendant Nelson has served as a Company director since August 2021. She also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Nelson solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to the reelection of Defendants Kemp and London to the Board. The 2022 Proxy Statement was also solicited on her behalf and the false and misleading elements contained therein led to Defendant Stanford's reelection to the Board and shareholders approving an amendment to the Incentive Plan to increase the Class A common stock authorized for issuance under the Incentive Plan by 6,000,000 shares.

For these reasons, Defendant Nelson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

201.    Additional reasons that demand on Defendant Stanford is futile follow. Defendant Stanford has served as a Company director since June 2021. He previously served on the Board of Legacy AS since 2017. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee. As a trusted Company director, Defendant Stanford conducted little, if any, oversight of the schemes to cause the Company to engage in the Overpayment Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Stanford solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to the reelection of Defendants Kemp and London to the Board. For these reasons, Defendant Stanford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.    Additional reasons that demand on the Board is futile follow.

203.    Demand in this case is further excused because Defendants Flournoy, Lehman, Nelson and Stanford are beholden to and controlled by Defendants Kemp and London, primary interested wrongdoers who were controlling shareholders during the Relevant Period. Defendants Kemp and London control their continued nomination to the Board. In light of this control, Defendants Flournoy, Lehman, Nelson and Stanford cannot impartially consider a demand against Defendants Kemp and London, as they are dependent on him for their continued positions with the Company and the compensation that goes with that. Thus, Defendants Flournoy, Lehman,

Nelson and Stanford are unable to evaluate a demand with disinterest or independence given Defendant Kemp's and London's control over them.

204.    The Director-Defendants have all materially benefitted from the fraudulent scheme to issue materially false and misleading statements and omissions of material fact. For example, on January 28, 2021, concurrent with Series C Financing, Defendants Kemp and London entered into a stock purchase agreement with certain investors under which Defendant London sold a total of 2,265,529 shares of Founders Preferred Stock for a total price of $15.0 million. Additionally, Defendant Kemp sold a total of 3,775,879 shares of Founders Preferred Stock for a total price of $25.0 million. ACME SPV AS, LLC, which Defendant Stanford is affiliated with, purchased 1,821,485 shares of Founder Preferred Stock from Defendant Kemp for a total purchase price of $12.1 million. In connection with the Merger, Defendant Kemp's annual base salary was increased from $256,000 to $600,000 and Defendant London's annual base salary was increased from $227,000 to $400,000. Moreover, in 2020, Defendant Kemp was issued 5,250,000 shares of Legacy Astra Class A common stock and an option to acquire 10,000 stock options and Defendant London was issued 1,750,000 shares of Legacy Astra Class A common stock, all of which were fully vested at the time of grant. For the fiscal year ended December 31, 2020, Defendant Kemp received $23,572,500 in stock awards and Defendant London received $7,857,500 in stock awards.

205.    Defendant Stanford also materially benefitted from his affiliation with ACME Capital, an early investor in Legacy AS that invested $600,00 into the Company on June 10, 2019 pursuant to a Convertible Note Purchase Agreement. During Series B Financing, ACME Capital was issued 8,989,019 shares of Legacy Astra Series B preferred stock on June 20, 2018 for an aggregate purchase price of $8,422,765. During Series C financing, ACME Capital was issued 584,964 shares of Legacy Astra Series C preferred stock on January 28, 2021 for an aggregate

purchase price of $820,160. In connection with the Merger, the outstanding shares of Legacy Astra Series B preferred stock and Legacy Astra Series C preferred stock were subsequently exchanged for shares of Class A common stock.

206.    The Director-Defendants also were unjustly enriched through grants awarded under the Incentive Plan, the purpose of which is to advance the Company's interests by providing for the grant of stock and stock-based awards to the Company's employees, directors, consultants, and advisors. As the Incentive Plan is administered by the Compensation Committee, Defendants Kemp, London, and Flournoy would be unable to make a demand against Defendants Stanford, Lehman, and Nelson, who are responsible for apportioning their compensation.

207.    As demonstrated by an investor presentation filed with the SEC on February 2, 2021 in which Defendants touted their "instant and persistent access to data," the Director-Defendants at all times had access to data which contradicted their public statements.

208.    Moreover, Director-Defendants knew, when making public statements about the Company's plan to conduct daily or near daily launches by 2025, that the Company would be unable to follow through on such plan. This is demonstrated by the earnings presentation discussed in ¶ 168 explaining the Company's planned increase to 600 kg payload capacity to compete for 75% of the total addressable market for small satellite launches instead of just 45%.

209.    Defendants Lehman, Nelson, and Stanford (the "Audit Committee Directors") served as members of the Audit Committee during the Relevant Period. Among other things, the Audit Committee Charter requires the committee members to oversee the audit process and Astra's legal compliance program, including "discuss[ing] with management and the independent auditor the Company's system of internal controls, its financial and critical accounting practices and its policies relating to risk assessment and management[]" and reviewing disclosures made by the

Company, CEO, and CFO during their certification process for Astra's annual and quarterly reports on Forms 10-K and 10-Q. In violation of the Audit Committee Charter, the Audit Committee Directors failed to adequately review and discuss the Company's Forms 10-Q, and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Directors breached their fiduciary duties, are not disinterested, and demand is excused as to them.

210.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. In addition, the Director-Defendants failed to secure and/or disclose any waivers of the Code of Conduct granted by the Board, which constitutes a further violation of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

211.    Astra has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against

the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Astra any part of the damages Astra suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

212.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

213.   The acts complained of herein constitute violations of fiduciary duties owed by Astra's controlling shareholder, officers, and directors. These acts are incapable of ratification.

214.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Astra. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if

such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

215.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Astra to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

216.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Defendants Kemp, London, Flournoy, Lehman, McCaw, Nelson, Stanford, Russell, Salemme, Weibling, Perry, and Massey for Violations of Section 14(a) of the Exchange Act**

217.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

218.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

219.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

220.     Under the direction and watch of Defendants McCaw, Russell, Ednie, Salemme, Weibling, Perry, and Massey, the Merger Proxy Statement failed to disclose that: (1) the total addressable market for small satellite launches precluded the Company's ability to have a daily launch cadence by 2025; (2) the plan to increase payload capacity to 500 kg relied on an agreement with Firefly under which the Company would manufacture Reaver engines using Firefly's IP; (3) the terms of the Firefly agreement effectively capped the Company's potential payload capacity at 500 kg to ensure that the Company would be unable to compete with Firefly and other small launch providers that can handle payload capacities greater than 500 kg.

221.     Defendants McCaw, Russell, Ednie, Salemme, Weibling, Perry, and Massey knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Merger Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the Merger Proxy Statement.

222.     The false and misleading elements of the Merger Proxy Statement led to, among other things, shareholders approving the business combination agreement, the Stock Issuance Proposal, and the Incentive Plan Proposal, allowing the Individual Defendants to breach their fiduciary duties to the Company and become greatly unjustly enriched. As a direct result of Defendants McCaw's, Russell's, Ednie's, Salemme's, Weibling's, Perry's, and Massey's misrepresentations and omissions in the Merger Proxy Statement, Holicity shareholders were deprived of their right to make an informed redemption decision regarding their Holicity shares prior to the Merger and were induced to accept inadequate consideration for the Merger.

223.    Moreover, under the direction and watch of Defendants Kemp, London, Flournoy, Lehman, McCaw, Nelson, and Stanford, the 2021 Proxy Statement failed to disclose that: (1) contrary to the 2021 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it; (2) certain Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) certain Individual Defendants, including those soliciting the 2021 Proxy Statement, were breaching their fiduciary duties to the Company and its shareholders and were thus improperly interested in receiving unjust compensation.

224.    The 2021 Proxy Statement was also materially misleading because it failed to disclose that: (1) the Company was unable to launch from "anywhere on the planet" since domestic launches could only take place at five commercial spaceports licensed by the FAA and international launches were unlikely to be approved because countries generally have a preference for their own member nation launch programs; (2) the Company's plan to achieve a daily or near daily launch cadence by 2025 was unsupported by the total addressable market for small satellite launches; (3) the plan to increase payload capacity to 500 kg relied on an undisclosed agreement with Firefly under which the Company would manufacture Reaver engines using Firefly's IP; (4) the terms of the Firefly agreement effectively capped the Company's potential payload capacity at 500 kg to ensure that the Company would be unable to compete with Firefly and other small launch providers that could handle payload capacities greater than 500 kg; (5) the Company faced a foreseeable risk of not executing its plan to achieve daily launches by 2025 given the total addressable market; and (6) the Company failed to maintain internal controls. As a result of the

foregoing, the Company's public statements were materially false and misleading at all relevant times.

225.   In the exercise of reasonable care, Defendants Kemp, London, Flournoy, Lehman, McCaw, Nelson, and Stanford should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, electing Defendants Kemp and London to the Board.

226.   The false and misleading elements of the 2021 Proxy Statement led to, among other things, shareholders electing Defendants Kemp and London, allowing them to continue breaching their fiduciary duties to the Company.

227.   Additionally, under the direction and watch of Defendants Kemp, London, Flournoy, Lehman, and Nelson, the 2022 Proxy Statement failed to disclose that: (1) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it; (2) certain Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) certain Individual Defendants, including those soliciting the 2022 Proxy Statement, were breaching their fiduciary duties to the Company and its shareholders and were thus improperly interested in receiving unjust compensation.

228.   The 2022 Proxy Statement was also materially misleading because it failed to disclose that: (1) the Company was unable to launch from "anywhere on the planet" since domestic launches could only take place at five commercial spaceports licensed by the FAA and

international launches were unlikely to be approved because countries generally have a preference for their own member nation launch programs; (2) the Company's plan to achieve a daily or near daily launch cadence by 2025 was unsupported by the total addressable market for small satellite launches; (3) the plan to increase payload capacity to 500 kg relied on an undisclosed agreement with Firefly under which the Company would manufacture Reaver engines using Firefly's IP; (4) the terms of the Firefly agreement effectively capped the Company's potential payload capacity at 500 kg to ensure that the Company would be unable to compete with Firefly and other small launch providers that could handle payload capacities greater than 500 kg; (5) the Company faced a foreseeable risk of not executing its plan to achieve daily launches by 2025 given the total addressable market; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

229.    In the exercise of reasonable care, Defendants Kemp, London, Flournoy, Lehman, and Nelson should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, electing Defendant Stanford to the Board.

230.    The false and misleading elements of the 2022 Proxy Statement led to, among other things, shareholders: (1) electing Defendant Stanford to the Board, allowing him to continue breaching his fiduciary duties to the Company and (2) approving an amendment to the Incentive Plan to increase the Class A common stock authorized for issuance under the Incentive Plan by 6,000,000 shares.

231.    The Company was damaged as a result of the material misrepresentations and omissions in the Merger Proxy Statement, the 2021 Proxy Statement, and the 2022 Proxy Statement.

232.    Plaintiff, on behalf of Astra, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

233.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

234.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

235.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

236.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

237.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was unable to launch from "anywhere on the planet" since domestic launches can only take place at five commercial spaceports licensed by the FAA and international launches are unlikely to be approved

because countries generally have a preference for their own member nation launch programs; (2) the Company's plan to achieve a daily or near daily launch cadence by 2025 was unsupported by the total addressable market for small satellite launches; (3) the plan to increase payload capacity to 500 kg relied on an agreement with Firefly under which the Company would manufacture Reaver engines using Firefly's IP; (4) the terms of the Firefly agreement effectively capped the Company's potential payload capacity at 500 kg to ensure that the Company would be unable to compete with Firefly and other small launch providers that can handle payload capacities greater than 500 kg; (5) one of the Company's risks was not executing on its plan to achieve daily launches by 2025 given the total addressable market; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

238. In further breach of their fiduciary duties, the Individual Defendants failed to correct these false and misleading statements and omissions of material fact, or ensure the Company had adequate internal controls to effect their disclosure, rendering them personally liable to the Company.

239. Moreover, Defendants Kemp, Brannon, Ednie, London, McCaw, Stanford, Russell, Salemme, Weibling, Perry, and Massey breached their fiduciary duties to the Company, or aided and abetted in such breaches, by engaging in and/or facilitating the Overpayment Misconduct.

240. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the

Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

241. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

242. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Astra has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

243. Plaintiff on behalf of Astra has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

244. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

245. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

246. The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

247.    Plaintiff, as a shareholder and a representative of Astra, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including from any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

248.    Plaintiff on behalf of Astra has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

249.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

250.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

251.    As a direct and proximate result of the Individual Defendants' abuse of control, Astra has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Astra has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

252.    Plaintiff on behalf of Astra has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

253.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

254.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

255.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Astra has sustained and will continue to sustain significant damages.

256.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

257.   Plaintiff, on behalf of Astra, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

258.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

259.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

260.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

261.   Plaintiff, on behalf of Astra, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Kemp, Brannon, Ednie, London, McCaw, Russell, Salemme, Weibling, Perry, and Massey for Contribution Under Sections 10(b) and 21D of the Exchange Act

262.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

263. Astra, along with Defendants Kemp, Brannon, Ednie, London, McCaw, Russell, Salemme, Weibling, Perry, and Massey are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Kemp's, Brannon's, Ednie's, London's, McCaw's, Russell's, Salemme's, Weibling's, Perry's, and Massey's willful and/or reckless violations of their obligations as controlling shareholders, officers, and/or directors of the Company.

264. Defendants Kemp, Brannon, Ednie, London, McCaw, Russell, Salemme, Weibling, Perry, and Massey, because of their positions of control and authority as controlling shareholders, officers, and/or directors of Astra, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Astra, including the wrongful acts complained of herein and in the Securities Class Action.

265. Accordingly, Defendants Kemp, Brannon, Ednie, London, McCaw, Russell, Salemme, Weibling, Perry, and Massey are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

266. As such, Astra is entitled to receive all appropriate contribution or indemnification from Defendants Kemp, Brannon, Ednie, London, McCaw, Russell, Salemme, Weibling, Perry, and Massey.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Astra, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to the Company;

(c)   Determining and awarding to Astra the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Astra and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Astra and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Astra to nominate at least three candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding Astra restitution from the Individual Defendants, and each of

them;

       (f)     Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

       (g)     Granting such other and further relief as the Court may deem just and

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 25, 2023             Respectfully submitted,

                               **THE BROWN LAW FIRM, P.C.**

                               */s/Timothy Brown*
                               Timothy Brown
                               767 Third Avenue, Suite 2501
                               New York, NY 10017
                               Telephone: (516) 922-5427
                               Facsimile: (516) 344-6204
                               Email: tbrown@thebrownlawfirm.net

                               *Counsel for Plaintiff*

## **VERIFICATION**

I, Adonis Gonzalez, am a plaintiff in the within action. I have reviewed the allegations made in this Verified Consolidated Shareholder Derivative Amended Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16 day of January, 2023.

Adonis Gonzalez